**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ROBERT W. VOGLER | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | 3:14 CV 00928 (JCH) |
| | : | |
| V. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| Defendant | : | OCTOBER 31, 2014 |

<u>**APPENDIX OF UNREPORTED CASES AND AUTHORITY**</u>

2013 WL 2950667
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

J.N. FEUER et al., Plaintiff(s),
v.
G. Kennedy THOMPSON et al., Defendant(s).
W.M. Rogers et al., Plaintiff(s),
v.
G. Kennedy Thompson et al., Defendant(s).

Nos. 10–CV–00279 YGR, 12–CV–00203 YGR.  |  June 14, 2013.

**Attorneys and Law Firms**

James E. Miller, Karen M. Leser–Grenon, Shepherd, Finkelman, Miller & Shah, LLC, Chester, CT, Marguerite R. Goodman, Richard D. Greenfield, Greenfield & Goodman LLC, New York, NY, Rosemary Farrales Luzon, Shepherd, Finkelman, Miller & Shah, LLP, San Diego, CA, Scott Rhead Shepherd, Shepherd Finkelman Miller Shah, LLP, Media, PA, Ilene Freier Brookler, Los Angeles, CA, for Plaintiffs.

Anna Erickson White, Paul T. Friedman, Morrison & Foerster LLP, Frank Burke Kennamer, Bingham McCutchen LLP, San Francisco, CA, Gilbert Ross Serota, Gabriel Nathan White, Arnold & Porter LLC, Jenna Musselman Yott, Gibson, Dunn and Crutcher, San Franciso, CA, Jonathan C. Dickey, Paul J. Collins, Gibson, Dunn & Crutcher LLP, Palo Alto, CA, for Defendants.

**ORDER RE ATTORNEYS' FEES REQUEST**

YVONNE GONZALEZ ROGERS, District Judge.

**\*1** Two related shareholder derivative actions were brought on behalf of Wells Fargo and Wachovia and against Directors of Wells Fargo and former Officers and Directors of Wachovia for corporate mismanagement, breach of fiduciary duty, waste of corporate assets, indemnification, and unjust enrichment. The parties negotiated a non-monetary settlement in which Wells Fargo will implement certain corporate governance reforms. The Court approved the settlement but reserved ruling on Plaintiffs' Motion for Award of Fees and Expenses.

Plaintiffs' counsel seek $1.8 million in attorneys' fees and expenses for prosecuting and settling both actions. Having considered the relevant factors, including the benefit conferred by the settlement, the time and effort expended by counsel, the contingent nature of counsel's representation, the difficulty and complexity of the litigation, and counsel's standing and ability, the Court finds that an award of attorneys' fees and expenses in the amount of $500,000 is reasonable. Therefore, the motion is **GRANTED IN PART** and **DENIED IN PART.**

**I. BACKGROUND**

Both *Feuer v. Thompson et al.,* Case No. 10–CV–00279 (*"Feuer* Action"), and *Rogers v. Thompson et al.,* Case No. 12–CV–00203 (*"Rogers* Action"), filed on January 20, 2010 and January 12, 2012, respectively, allege that former officers and directors of Wachovia disregarded their fundamental fiduciary responsibilities, including in the purchase of Golden West Bank, and disregarded the risks undertaken by Wachovia with respect to the packaging of subprime mortgages into collateralized debt obligations and other securities. The claims against the Wells Fargo directors arise out of their failure to pursue these claims against the former officers and directors of Wachovia, and for approving a no-consideration settlement in *Arace v. Thompson et al.,* Case No. 08–7905 (S.D.N.Y.) (*"Arace* Action"), which purported to release virtually any and all claims against the former officers and directors of Wachovia (including many of the claims brought in the *Feuer* and *Rogers* Actions). The *Feuer* Action and the *Rogers* Action asserted virtually indistinguishable claims arising out of the same conduct. Plaintiffs in both Actions are represented by the same counsel.

Approximately one month after filing the *Feuer* Action, counsel for Plaintiffs were informed by Wachovia's counsel that many of the claims brought by Mr. Feuer had been released in the settlement of the *Arace* Action. On November 24, 2010, Mr. Feuer filed a motion in the *Arace* Action to set aside the judgment. On August 17, 2011, the Court in the *Arace* Action denied Mr. Feuer's motion, and on September 16, 2011, Mr. Feuer appealed to the United States Court of Appeals for the Second Circuit.

While the motion collaterally attacking the judgment in the *Arace* Action was under submission, the *Feuer* Action was stayed from February 10, 2011 through December 14, 2011. Approximately one month after the stay was lifted in the *Feuer* Action, on January 12, 2012, Plaintiffs' counsel filed the *Rogers* Action.

**\*2** Beginning in early February 2012, the parties began informal discussions in an effort to resolve both the *Feuer* and *Rogers* Actions, which culminated in a global resolution of both Actions. Owing to a ten-month stay of the proceedings (while Mr. Feuer collaterally attacked the judgment in the *Arace* Action) followed by settlement negotiations, aside from settlement negotiations themselves, very little substantive work was done in either the *Feuer* or *Rogers* Action. The only substantive work in the *Feuer* Action was the pre-suit demand, drafting two complaints, and drafting an opposition to the Defendants' motions to dismiss. The only substantive activity in the *Rogers* Action was the filing of the initial Complaint. [1]

As a result of Plaintiffs' counsel's efforts in the prosecution and settlement of the *Feuer* and *Rogers* Actions, Wells Fargo has agreed that its Board will adopt an Acquisition Oversight Policy and the Risk Committee of the Wells Fargo Board will retain an outside consultant each year for three years to advise the Risk Committee on risk concerns. For this modest, non-monetary, "therapeutic" achievement, Plaintiffs' counsel seek the sum of $1.8 million.

## II. DISCUSSION

Because Delaware law governs the claims, it also governs the fee award. *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir.2002) (citing *Mangold v. Calif. Pub. Utils. Comm'n,* 67 F.3d 1470, 1478 (9th Cir.1995)).

## A. APPROPRIATENESS OF AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Attorneys' fees may be awarded in a derivative action only where the settlement confers a "specific and substantial benefit" on the corporation. *See San Antonio Fire & Police Pension Fund v. Bradbury,* 2010 WL 4273171, at \*8 (Del.Ch. Oct.28, 2010) (citing *Chrysler Corp. v. Dann,* 223 A.2d 384, 386 (Del.1966)). [2] The benefit conferred need not be monetary; however, it must "be 'substantial' in the sense that its value to the interested class [or the corporation] is immediately discernible rather than speculative in character." *Richman v. DeVal Aerodynamics, Inc.,* 185 A.2d 884, 885 (Del.Ch.1962) (cited in *McDonnell Douglas Corp. v. Palley,* 310 A.2d 635, 636 (Del.1973)); *see also Chicago Milwaukee Corp. v. Eisenberg,* 560 A.2d 489 (Del.1989) ("where shareholder litigation confers a substantial benefit on a corporation and no fund is available

to pay for the fees and expenses of plaintiff's counsel, it is appropriate for the corporation to absorb the costs of plaintiff's attorneys' fees and expenses."). The settlement has resulted in the implementation of corporate governance reforms. " 'Courts have recognized that corporate governance reforms provide valuable benefits' to corporations and their shareholders." *Wixon v. Wyndham Resort Dev. Corp.,* Case No. 07–CV–02361 JSW, 2010 WL 3630124 (N.D.Cal. Sep.14, 2010) (quoting *In re NVIDIA Corp. Derivative Litig.,* Case No. 06–CV–06110 SBA, 2009 U.S. Dist. LEXIS 24973, at \*11 (N.D.Cal. Mar. 18, 2009)). The Court finds that an award of attorneys' fees is warranted under the substantial benefit theory. Having concluded that Plaintiffs' counsel are entitled to an award of attorneys' fees and expenses, the Court must now determine an appropriate award.

## B. REASONABLE AWARD OF ATTORNEYS' FEES AND EXPENSES

**\*3** In determining an appropriate fee award, a court applying Delaware law considers the *"Sugarland"* factors: (1) the benefits achieved in the action; (2) the efforts of counsel and the time spent in connection with the case; (3) the complexity of the litigation; (4) the contingent nature of the case; and (5) the standing and ability of counsel. *In re Cox Commc'ns, Inc. Shareholders Litig.,* 879 A.2d 604, 640 (Del.Ch.2005) (citing *Sugarland Indus., Inc. v. Thomas,* 420 A.2d 142, 147–50 (Del.1980)). Courts place the greatest weight on the benefit conferred by the litigation. *Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1254 (Del.2012), *rearg. den.* (Sep. 21, 2012). "The time expended by counsel is considered as a cross-check to guard against windfalls, particularly in therapeutic benefit cases" such as this. *In re Sauer–Danfoss Inc. Shareholders Litig.,* ––– A.3d ––––, 2011 WL 2519210, at \*17 (Del.Ch. Apr.29, 2011) (citing *Brinckerhoff v. Tex. E. Prods. Pipeline Co.,* 986 A.2d 370 (Del.Ch.2010)). "The party petitioning for attorneys' fees necessarily bears the burden of persuasion on the elements of that claim." *Wininger v. SI Mgmt. L.P.,* 301 F.3d 1115, 1125 (9th Cir.2002).

Counsel portray the case as highly complex and extremely difficult, their labors as extensive, and the results achieved by the settlement as outstanding. Despite this portrayal, they have provided scant support for their assertions and inapposite cases to show that the requested fee award is reasonable. While the benefits conferred upon Wells Fargo and its shareholders from these remedial measures form an adequate basis to warrant an award of attorneys' fees, the fees requested are way out of proportion to the benefit conferred upon Wells Fargo and its shareholders.

### 1. The benefit conferred by the litigation

The value of a therapeutic benefit such as the corporate governance reforms provided in this case is not easily translated into monetary terms. *Unite Nat. Ret. Fund v. Watts,* 2005 WL 2877899, at *5 (D.N.J. Oct.28, 2005); *see Rosen v. Smith,* 11 Del. J. Corp. L. 989, 993, 1985 WL 21143 (Del.Ch. Sep.23, 1985)* ("Obviously it is much more difficult to ascertain the reasonableness of an award of attorney fees where no fund has been created and where the value of the benefit is unclear."). In therapeutic benefits cases, courts applying Delaware law will compare fees awarded in lawsuits that achieved similar results. *In re Golden State Bancorp Inc. Shareholders Litig.,* 2000 WL 62964 (Del.Ch. Jan.7, 2000)* ("In cases generating nonquantifiable, nonmonetary benefits, this Court has juxtaposed the case before it with cases in which attorneys have achieved approximately the same benefits."); *In re Dunkin' Donuts Shareholders Litig.,* 16 Del. J. Corp. L. 1443, 1457, 1990 WL 189120 (Del.Ch. Nov.27, 1990)* ("When an unquantifiable benefit is involved, the *quantum meruit* approach gives the Court a more equitable means of determining a reasonable fee"). [3] "In the context of a therapeutic benefit case, fee awards are minimized where the benefit is intangible or limited in duration."*In re Golden State Bancorp Inc. Shareholders Litig., supra,* 2000 WL 62964, at *3.

**\*4** "As proponents of the fee application, plaintiffs have the burden of establishing the value of the claimed benefit."*In re Am. Real Estate Partners,* 1997 WL 770718 (Del.Ch. Dec.3, 1997)* (citing *In re Diamond Shamrock Corp.,* 14 Del. J. Corp. L. 652, 659 (Sep. 14, 1988)* ("The parties' inability to quantify the benefit leaves the Court without any yardstick against which to measure the reasonableness of the $1,075,000 fee request, other than on a *quantum meruit* basis")). Counsel for Plaintiffs seem to conflate their burden to show that an award of fees is appropriate under a substantial benefit theory with their burden to demonstrate that the substantial benefit achieved by the litigation entitles them to the fee award requested. Plaintiffs argue that the former justifies the latter.

Plaintiffs cite to a series of inapposite cases for the misguided proposition that "courts have not hesitated to approve substantial attorneys' fees."Unlike the settlement in this action, the referenced settlements involved "substantial," [4] "significant" [5] and/or "sweeping" [6] corporate governance reforms that justified "substantial attorneys' fees" awarded. In contrast, the benefit achieved by the litigation here was

modest and of limited duration. Thus, the referenced cases do not support Plaintiffs' counsel's substantial fee request.

To justify their fee request, Plaintiffs' counsel also provide a string cite to orders approving prior settlements, each with a fee number in parentheses. A string cite of this nature provides no information about the terms of the prior settlement, the benefits achieved, the efforts that merited the fee, or any of the other pertinent factors. The Court notes, however, that each of the five string-cited cases involved a negotiated fee agreement, which generally is not subjected to the same level of judicial scrutiny as a disputed fee request, and hence, should be accorded less precedential weight. *See In re Sauer–Danfoss Inc. Shareholders Litig., supra,* 2011 WL 2519210, at *18 ("de-emphasizing the precedential value of uncontested fee awards" where justification for fee was lengthy string-cite without meaningful analysis of the relationship between the benefit and the fee). In four of the cases the district court entered a form of order. [7] Only one order, *In re Rambus Inc. Derivative Litig.,* provides the information underlying the fee award. Unlike the present settlement, *Rambus involved significant and far-reaching corporate governance reforms.* [8] 2009 WL 166689 (N.D.Cal. Jan.20, 2009)* ("the reforms provide substantial benefits to Rambus and its shareholders by not only changing Rambus' options granting practices, thereby preventing any backdating of Rambus stock options in the future, but also several of the reforms go beyond such practices and require the implementation of broader corporate governance reforms which will have positive long-lasting effects on Rambus and its shareholders."). For the corporate governance reforms achieved in *Rambus,* counsel was awarded $2 million, which is approximately 10% more than what Plaintiffs' counsel request here. Rather than supporting counsel's fee request, the case confirms that counsel's fee request is out of proportion to the benefit conferred upon Wells Fargo and its shareholders.

**\*5** After reviewing the pertinent case law, [9] including the many decisions cited by the parties, the Court concludes that a therapeutic benefit provided in a case such as this warrants a $500,000 fee award.

### 2. The efforts of counsel and the time spent in connection with the case

This factor has two components: (a) time and (b) effort. *See In re Sauer–Danfoss Inc. Shareholders Litig., supra,* 2011 WL 2519210, at *20. "The more important aspect is effort, as in what plaintiffs' counsel actually did."*Id.* Although the

effort component is the primary consideration, the Court will consider the time/hours claimed by counsel first.

*a) Time*

Attorneys' fees in shareholder actions must be calculated so as to "fairly compensate successful attorneys and encourage continued vigilance by the bar." *Goodrich v. E.F. Hutton Grp., Inc.,* 681 A.2d 1039, 1050 (Del.1996); *Cooperstock v. Pennwalt Corp.,* 820 F.Supp. 921, 926–27 & n. 7 (E.D.Pa.1993) ("Allowances should be sufficiently liberal to compensate lawyers adequately so that use of the derivative action to police corporate management will be encouraged, but awards should not be so generous as to foster strike suits."). [10] Equally important to the incentive to bring meritorious lawsuits is the incentive to litigate these suits efficiently. *Seinfeld v. Coker,* 847 A.2d 330, 339 (Del.Ch.2000) ("the Court does not want to be in a position of encouraging the churning of wheels and devoting unnecessary hours to litigation in order to be able to present larger numbers to the Court.") (quoting *In re Pullman Co. Shareholders Litig.,* Consol. C.A. No. 10013, Berger, V.C. (Del. Ch. Nov. 29, 1988)). Here, two considerations steer the Court's analysis.

First, the records show excessive billing. Two law firms participated as counsel for plaintiffs, Greenfield & Goodman, LLC ("G & G") and Shepherd, Finkelman, Miller, and Shah, LLP ("SFMS"). Counsel have provided the Court with summary tables of the fee request broken down by name, hourly rate, hours, and total. They have provided no information from which the Court may gauge the reasonableness of the hours expended or the reasonableness of the hourly rate requested. [11] Counsel claim billable amounts totaling $1,468,553.20 based upon 2206.35 hours worked in the *Feuer* and *Rogers* Actions, and also seek to be reimbursed for work done in the separate *Arace* Action, an average billable rate of $665.60 per hour (the full fee request of $1.8 million yields a billable rate of $815.83 per hour). Even the cursory information provided in the "summary tables" reveals that the hours expended (and hence, the fees requested) are excessive.

The law firm of G & G claims to have expended 1046.05 hours for a "lodestar" [12] amount of $818,428.75, which averages to $782.40 per hour. Nearly half of the hours (49.4%) were billed by Richard D. Greenfield, who claims a $985 per hour billing rate. Nothing in the record reflects that Mr. Greenfield's experience, standing or ability merits on

hourly rate of nearly $1000 per hour. [13] Nor does the record reflect any justification for allocating such a high proportion of work to an attorney with the highest billing rate.

**\*6** The SFMS law firm claims to have worked 1160.30 hours for a "lodestar" amount of $650,124.50, which averages to $560.31 per hour (this hourly rate includes the work of eight legal assistants/ paralegals). SFMS's summary table also reflects inefficient use of staff, billing for the use of seventeen individuals, five of whom billed less than ten hours, including a legal assistant/paralegal who worked on the case for six minutes.

Second, Plaintiffs' counsel seek reimbursement for work performed on another case, the *Arace* Action, during the ten months that this litigation was stayed. The time spent on the *Arace* Action is not compensable in this litigation. *See Arbitrium (Cayman Islands) Handels AG v. Johnston,* 705 A.2d 225, 237 (Del.Ch.1997)*aff'd,*720 A.2d 542 (Del.1998) ("An award of attorneys' fees is limited to the fees reasonably incurred to prosecute this action."). Counsel have not explained how the motion to set aside the *Arace* judgment, which was denied, or the appeal of that order, which was voluntarily dismissed, [14] contributed to the settlement or conferred a benefit on Wells Fargo. *In re Infinity Broad. Corp. Shareholders Litig.,* 802 A.2d 285, 292 (Del.2002) ("the New York litigation neither promoted or influenced the global settlement in any meaningful way nor resulted directly in any benefit to the shareholder class."). [15] Although Plaintiffs argue that the settlement in this case releases claims alleged in the *Arace* Action and appeal, counsel for Plaintiffs have not justified an award of fees based upon work in connection with a separate lawsuit.

*b) Effort*

The effort expended in these Actions was minimal despite the time claimed. [16] Aside from the complaints and confirmatory discovery, Plaintiffs actually litigated very little, apart from the settlement negotiations themselves. Furthermore, many of the hours were spent on matters unrelated to this case (*e.g.,* attacking the *Arace* judgment) or that did not confer a benefit on Wells Fargo (*e.g.,* drafting fee petition, [17] attacking the *Arace* judgment). Nor have Plaintiffs explained the benefit conferred upon Wells Fargo through Plaintiffs' counsel filing the *Rogers* action, a second shareholder action, substantially similar to the *Feuer* action.

The Court cannot conclude that all the time was wisely spent or that the class benefitted from the majority of the effort expended. Nothing about this factor warrants departure (up or down) from the range of similar settlements identified in factor 1, above.

### 3. The relative complexity of the litigation

While shareholder lawsuits by their nature are complex, Plaintiffs have not shown these Actions to be notably difficult or complex. *In re Cox Commc'ns, Inc. Shareholders Litig., supra,* 879 A.2d at 641 ("[T]here was not much work to be done, except in negotiating and later conducting confirmatory discovery of a settlement. There is no special complexity to the case."). Aside from opposing a motion to dismiss filed in the *Feuer* Action, the litigation was not complex. In fact, the main complexity cited in the fees motion was work done in a different case, mounting a collateral attack on the judgment in the *Arace* Action.

**\*7** Nothing about this factor warrants departure from the range of similar settlements identified in factor 1, above.

### 4. Contingency risk

The Court understands, based upon the affidavits accompanying the motion for attorneys' fees, that the cases were undertaken on a contingency basis. The Court recognizes that counsel undertook a risk of spending many hours and incurring expenses in this litigation without any assurance they would be paid for that time. However, this is a normal risk in shareholder litigation suits.

Nothing in this litigation justifies a risk-premium for taking the case on a contingency basis so as to depart from the range of similar settlements identified in factor 1, above.

### 5. The standing and ability of counsel

The attorneys who prosecuted the action represent that they have experience in shareholder and derivative litigation. Wells Fargo does not challenge the standing or ability of Plaintiffs' counsel.

Nothing about this factor warrants departure from the range of similar settlements identified in factor 1, above.

### 6. Conclusion regarding "Sugarland" factors

After considering the above factors, the Court finds that a reasonable attorneys' fee in this case is $500,000, which includes Plaintiffs' counsel's expenses in this litigation. The Court considers this award generous in the circumstances. "This is no condemnation of the services of counsel. Instead, this Court considers it a commendation for good work done on a contingency with modest ... success." *In re Northwestern Corp. Derivative Litig.,* 414 F.Supp.2d 914, 917 (D.S.D.2005).

### III. CONCLUSION

Accordingly, the Motion for Award of Attorneys' Fees and Expenses is **GRANTED IN PART** and **DENIED IN PART.** The Court awards a total of $500,000 for attorneys' fees and litigation expenses.

This terminates Dkt. No. 132 in Case No.: 10–CV–00279 and Dkt. No. 20 in Case No.: 12–CV–00203.

**IT IS SO ORDERED.**

### Footnotes

1    The complaint in the *Rogers* Action was never answered, no motions were filed, and no discovery was taken in the case. Although both Actions were preceded by pre-suit demands upon the Wachovia Board and/or Wells Fargo Board, Plaintiffs' counsel did not make a demand on behalf of Mr. Rogers. Thus, Plaintiffs' counsel is not entitled to reimbursement for the time and effort of a pre-suit demand counsel did not make.

2    Under Delaware law, a fee award is appropriate if (i) the suit was meritorious when filed; (ii) the action producing the corporate benefit; and (iii) the resulting corporate benefit was causally related to the lawsuit. *United Vanguard Fund, Inc. v. TakeCare, Inc.,* 693 A.2d 1076, 1079 (Del.1997) (citing *Allied Artists Pictures Corp. v. Baron,* 413 A.2d 876, 878 (Del.1980)). There is no dispute that the suit was meritorious when filed, conferred a benefit on Wells Fargo, and that the benefit is causally connected to this lawsuit, the dispute is over the size of the benefit conferred.

3    In some cases parties have proffered expert opinions to quantify the value of a therapeutic settlement such as corporate governance changes. *In re Compellent Technologies, Inc. Shareholders Litig.,* 2011 WL 6382523, at \*20–21 (Del.Ch. Dec.9, 2011) ("The calculation does not aspire to mathematical exactitude.... The calculation only serves to help establish an order of magnitude within

which this Court can craft an appropriate award. Perhaps most important, it aids the Court in resisting overly generous awards by establishing a link between nonmonetary benefits and one measure of economic value. Although the resulting calculation is admittedly rough, scientific precision is not required when awarding fees."); *Unite Nat. Ret. Fund, supra,* 2005 WL 2877899, at *3, 5 ("Plaintiffs' expert, Mr. Monks, opines that the added value to Shell resulting from this settlement agreement is not less than $2.3 billion"); *Mesh v. Goldfield Corp.,* 60 F.R.D. 595, 598 (S.D.N.Y.1973) (accepting estimate of financial analyst proffered by corporation, who valued economic benefit of the entire settlement agreement was $422,000, over Plaintiff's expert, who estimated benefit of $750,000).

4    *In re Schering–Plough Corp. Shareholder Derivative Litig.,* 2008 WL 185809 (D.N.J. Jan.14, 2008), involved substantial "structural" changes to the company's corporate management and governance, including a 350% increase in governance and compliance spending. Additionally, Plaintiffs' counsel in *Schering–Plough* had expended over 13,000 hours on the litigation; the proposed award was recommended by a third-party mediator, and agreed upon by the parties and the insurance carriers who would pay the award.

5    The settlement in *Lambrecht v. Taurel,* provided **"numerous and significant governance changes** over the next three years, including adoption of 'Product Safety and Medical Risk Management' and 'Compliance' Core Objectives. The Stipulation also provides for changes in board-level and management-level positions, and outlines changes in compensation, compliance training, discipline, and monitoring."2010 WL 2985946 (S.D.Ind. Jun.8, 2010)*report and recommendation adopted,*2010 WL 2985943 (S.D.Ind. Jul.27, 2010) (emphasis supplied). Plaintiffs' counsel Richard D. Greenberg was counsel in *Lambrecht,* and, unlike the fee request here, counsel in *Lambrecht* supported their fee request with " 'detailed information regarding the lodestar incurred in the case, broken down into seven separate categories of tasks' and 'a detailed breakdown, by firm and by category of expenses, of the total expenses incurred to date by Plaintiffs' counsel.' "

6    *Unite Nat. Ret. Fund, supra,* involved **"sweeping and unprecedented"** corporate governance reforms expected to "result in **billions of dollars** of increased market capitalization" for the company; and the company agreed to the requested fee award. 2005 WL 2877899, at *3, 5 (emphasis supplied).

7    *In re Extreme Networks, Inc. Derivative Litig.,* Case No. 07–CV–02268 RMW, at ¶ 9 (N.D.Cal. Jul. 15, 2011) ("The Court hereby approves the Fee and Expense Award in accordance with the Stipulation and finds that such fee is fair and reasonable."); *Pirelli Armstrong Tire Corp. Retiree Medical Benefit Trust v. Sinegal,* Case No. 08–CV–01450 (W.D.Wash. Jun.10, 2011) ("The Court hereby approves the Fee Award in accordance with the Stipulation of the parties."); *In re F5 Networks, Inc. Derivative Litig.,* Case No. 06–CV–00794, at ¶ 8 (W.D.Wash. Jan. 6, 2011) ("The Court finds that the Fee Award of $5,000,000.00 is fair and reasonable, and hereby approves the Fee Award."); *Alaska Elec. Pension Fund v. Olofson,* Case No. 08–CV–02344, at ¶ 8 (D.Kan. Aug. 25, 2010) ("The Court hereby approves the Fee and Expense Award to Plaintiffs Counsel in accordance with the Stipulation and finds that such fee is fair and reasonable.").

8    According to the order, the Settlement in *Rambus* provided that:

    Rambus will adopt and implement several significant corporate governance reforms, including: 1) significant amendments to the Compensation Committee Charter; 2) stock ownership guidelines for the Company's executive officers and directors; 3) the hiring of a new Vice President of Finance with experience in public accounting as well as in senior accounting roles in a public company, who will oversees all of Rambus' accounting functions; 4) the hiring of two Assistant Corporate Controllers to oversee revenue recognition and financial systems and to oversee external reporting; and 5) the requirement that all finance, accounting, and stock administration staff attend training in various areas of GAAP. In addition to the corporate governance reforms, Rambus agreed to pay $2 million in attorneys' fees and expenses.

    *In re Rambus Inc. Derivative Litig., supra,* 2009 WL 166689, at *2.

9    *See e.g., In re Golden State Bancorp Inc. Shareholders Litig., supra,* 2000 WL 62964, at *3 n. 19 (awarding $500,000 fee award for therapeutic settlement) (collecting cases involving attorneys' fees awards for therapeutic settlements; fee awards ranged from $180,000 to $400,000); *In re Chicago & N.W. Transp. Co. Shareholders Litig.,* 1995 WL 389627, at *5 (Del.Ch. Jun.26, 1995) (finding that class counsel's request of $525,000 at "high end of the range of fee awards for settlements providing only therapeutic benefits," and awarding $300,000); *In re Sauer–Danfoss Inc. Shareholders Litig., supra,* 2011 WL 2519210 (range for attorneys' fees in disclosure only settlements is $400,000 to $500,000 for one or two meaningful disclosures).

10    A strike suit involves a shareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefiting the corporation on behalf of which the suit is theoretically brought. *Cooperstock, supra,* 820 F.Supp. at 927 n. 7.

11    Counsel have expressed an ability to provide detailed billing records. When a party has submitted inadequate records, a court is "neither obligated to explain what type of records should be submitted, nor to request additional information. The burden of presenting the appropriate fee documentation rests squarely on the shoulders of the attorneys seeking the award."*In re Washington Public Power Supply System Securities Litig.,* 19F.3d 1291, 1306 (9th Cir.1994)."Where the documentation of hours is inadequate, the district court may reduce the award accordingly."*Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Because the

value of the settlement warrants a significantly lower fee than counsel's claimed "lodestar" amount, the Court need not focus on this sub-factor as a cross-check to guard against a windfall.

12   Under the lodestar/multiplier method, the Court first calculates the "lodestar" by multiplying the reasonable hours expended by a reasonable hourly rate. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). The court may then enhance the lodestar with a "multiplier," if necessary, to arrive at a reasonable fee. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

13   In a previous shareholder litigation, Mr. Greenfield similarly failed to justify his hourly billing rate:

> Richard D. Greenfield sought an hourly rate of $495.00. His rate is apparently twice that of almost all admitted attorneys authorized to practice in this action and who seek fees in this petition. I cannot understand that request. Nothing in the record reflects that Greenfield's experience, standing or ability merits on hourly rate of almost $500 per hour.

> *PaineWebber R & D Partners II, L.P. v. Centocor, Inc.,* 2000 WL 130632, at *5 (Del.Ch. Jan.31, 2000).

14   The appeal was withdrawn in March 2012, approximately one month after the commencement of settlement discussions in the *Feuer* and *Rogers* Actions.

15   Not only have counsel not demonstrated that their efforts in the *Arace* Action contributed to the resolution of this litigation, their efforts collaterally attacking the judgment in *Arace* may have delayed resolution of this proceeding. The *Feuer* Action was stayed for ten months while Mr. Feuer collaterally attacked the judgment in the *Arace* Action. Soon after the stay was lifted in the *Feuer* Action, the parties began informal discussions in an effort to resolve the *Feuer* and *Rogers* Actions, which culminated in a global resolution of both Actions.

16   Plaintiffs' counsel, Richard D. Greenfield, states that he will monitor implementation of the corporate governance reforms outlined in the Settlement Agreement and this should be factored into any fee award. Wells Fargo disagrees that Mr. Greenfield will provide these services in the future. That said, Plaintiffs' counsel has not demonstrated that these services are compensable prior to performance or compensable as attorneys' fees in either the *Feuer* or *Rogers* Actions.

17   *Louisiana State Employees' Ret. Sys. v. Citrix Sys., Inc.,* 2001 WL 1131364 (Del.Ch. Sep.19, 2001) (explaining that "plaintiff's counsel cannot recover for costs incurred in pursuing their fee application" because such work confers no benefit on the corporation).

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1238651, 99 A.F.T.R.2d 2007-2501, 2007-1 USTC P 50,506

2007 WL 1238651
United States District Court,
D. Connecticut.

Dennis M. GAVIGAN and
Laura A. Gavigan, Plaintiffs,
v.
COMMISSIONER, INTERNAL REVENUE
SERVICE, and the United States, Defendants.

No. 3:06−CV−942 (PCD). | April 27, 2007.

**Attorneys and Law Firms**

Dennis M. Gavigan, Middletown, CT, pro se.

Laura A. Gavigan, Middletown, CT, pro se.

Lisa L. Bellamy, U.S. Department of Justice, Washington, DC, for Defendant.

***RULING ON MOTION TO DISMISS***

PETER C. DORSEY, U.S. District Judge.

**\*1** Defendants, the Commissioner of the Internal Revenue Service and the United States, move to dismiss Plaintiffs' action, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons stated herein, Defendants' Motion to Dismiss [Doc. No. 19] is **granted in part** and **denied in part**.

**I. BACKGROUND**

Plaintiffs Dennis M. Gavigan and Laura A. Gavigan are residents of Middletown, Connecticut, and are proceeding pro se. Plaintiffs bring a series of claims alleging unlawful tax collection and assessment based on various taxes assessed and liens and levies imposed for tax years 1998–2005. On June 10, 2004, the Internal Revenue Service ("IRS") issued a Notice of Federal Tax Lien ("NFTL") in the amount of $29,460.47 for tax periods 1998–2001. (Am.Compl.¶ 13, Ex. B.)[1] On June 18, 2004, the Middletown Town Clerk recorded a NFTL against Plaintiffs' property which was prepared by the IRS for the same amount covering the same tax periods as the June 10th NFTL. (Am.Compl.¶ 15, Ex. C.) On June 14, 2004, the IRS issued to Fleet National Bank ("Fleet") a Notice of

Levy ("NOL") in the amount of $30,694.48 against Plaintiffs' bank deposits for tax years 1998–2001. (Id. ¶¶ 18, 31, Ex. E.) Neither a warrant of distraint, a court order, nor a notice of seizure was appended to the NOL. (Id. ¶¶ 10, 20.)In response to the NOL, Fleet surrendered $3,340.45 of Plaintiffs' money to the government. (Id. ¶¶ 9, 19, Ex. F.) On November 4, 2005, the Middletown Town Clerk filed and recorded a second NFTL against Plaintiffs' property in the amount of $11,540.41 for tax years 1996, 1997, and 2004. (Id. ¶¶ 16, 17, Ex. D.)[2] On January 18, 2006, the IRS issued the following NOLs, each in the amount of $30,155.94 for tax years 1998–2001: to Fleet against Plaintiffs' deposits (Am.Compl.¶ 25, Ex. H); to Citizens Bank of Connecticut against Plaintiffs' deposits (id. ¶ 26, Ex. I); to Bio–Medical Applications against Plaintiffs' wages (id. ¶ 27, Ex. J); and to P & B Trucking against Plaintiffs' wages. (Id. ¶ 28, Ex. K.)

In February 2006, Plaintiffs sent numerous Freedom of Information Act ("FOIA") requests to the IRS for various documents pertaining to the assessment of Plaintiffs' tax deficiency. (Am.Compl.¶¶ 44, 55, 60, 63, 65, 66, Exs.M, O–1, O–2, O–3, Q–1, Q–2, R, S.) In addition to their FOIA requests, on February 9, 2006 Plaintiffs sent the IRS Area Director of the North Atlantic Region a request titled "Release of Liens/Levy; Request for Refund/Abatement of Improper Assessments or Liability; Attempt to Exhaust Administrative Remedies."(Id. ¶ 68, Ex. T.) On April 30, 2006, Plaintiffs submitted to the IRS five separate Form 843s, "Claims for Refund and Request for Abatement," claiming a 1040A tax refund in the amounts of $3,340.45, $11,745.85, $11,861.05, $5,555.99, and $1,531.59 for tax years 1998– 2001 respectively. (Id. ¶¶ 23, 71–74, Exs.G, V, W, X, Y.) Each Form 843 noted that the reason for the claim of refund/ abatement was that "collection was legally unenforceable." The IRS has not responded to any of these claims. (Id. ¶¶ 24, 69, 75.)Plaintiffs further allege that they filed timely requests for their 2003, 2004, and 2005 overpayments, which the IRS has not yet refunded. (Id. ¶¶ 76–81.)

**\*2** On May 3, 2006, Plaintiffs sent the IRS a Notice of Intent to Sue. (Am. Compl. ¶ 69, Ex U.) After more than 30 days elapsed without their receiving a response from the IRS (id. ¶ 70), Plaintiffs commenced this action on June 20, 2006. On October 11, 2006, they filed their Amended Complaint, in which they assert claims against the Commissioner of the IRS and the United States for improper assessment and collection of taxes, failure to abate, failure to refund tax overpayments, failure to release a lien and levy, unjust enrichment, fraud, negligence, intentional infliction of emotional distress, and

2007 WL 1238651, 99 A.F.T.R.2d 2007-2501, 2007-1 USTC P 50,506

violations of the Fourth, Fifth and Fourteenth Amendments. (*Id.* ¶¶ 5, 29, 82–124.)On November 28, 2006, Defendants filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II. STANDARD OF REVIEW

### A. Lack of Subject Matter Jurisdiction under Fed.R.Civ.P. 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate it. FED.R.CIV.P. 12(b)(1); *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing that it exists, *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996) (citation omitted), and the Court should not draw argumentative inferences in her favor. *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l,* 968 F.2d 196, 198 (2d Cir.1992) (citation omitted). When considering a motion to dismiss for lack of subject matter jurisdiction, the court "must determine whether or not the factual predicate for subject matter exists."*Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 733 (D.Conn.2003) (citation omitted). In making a determination of a motion to dismiss under Rule 12(b)(1), a court is not "limited to the face of the complaint, but may consider evidence, including affidavits submitted by the parties."*Id.* at 733 (citing *Robinson v. Malaysia,* 269 F.3d 133, 141 (2d Cir.2001)).

### B. Failure to State a Claim under Fed.R.Civ.P. 12(b)(6)

In determining a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff."*Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997)."The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims."*Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir .1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (internal quotations omitted)). A district court should not grant a motion to dismiss under Rule 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct.

2893, 106 L.Ed.2d 195 (1989) (internal citation omitted). Furthermore, in deciding a Rule 12(b)(6) motion, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."*Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (citation and internal quotations omitted); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999).

### C. Special Considerations for Pro Se Plaintiffs

**\*3** As stated previously, Plaintiffs are proceeding pro se. The Second Circuit has repeatedly cautioned that because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel."*Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 776 (2d Cir.2002) (citation and internal quotations omitted). The Second Circuit has also emphasized that "pro se litigants ... cannot be expected to know all of the legal theories on which they might ultimately recover," and, accordingly, "[i]t is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim."*Phillips v. Girdick,* 408 F.3d 124, 130 (2d Cir.2005). It is up to the district court to determine what claims a pro se plaintiff's complaint could raise, and in doing so, " 'the court's imagination should be limited only by [the plaintiff]'s factual allegations, not by the legal claims set out in his pleadings.'" *Ford v. New Britain Trans. Co.,* Case No. 3:03cv150 (MRK), 2005 WL 1785269, at \*1 (D.Conn. July 26, 2005) (quoting *Phillips,* 408 F.3d at 130). Importantly, however, the Court is not required to engage in "rank speculations" in an effort to manufacture a federal claim for pro se plaintiffs, *Ford,* 2005 WL 1785268 at \*5, and thus, a court may dismiss a complaint if it appears beyond doubt that no set of facts could be proven that would establish an entitlement to relief. *Weixel v. Bd. of Educ. of New York,* 287 F.3d 138, 145–46 (2d Cir .2002).

## III. DISCUSSION

The Government moves to dismiss Plaintiffs' action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs' action is barred by the sovereign immunity of the United States, the Anti–Injunction Act, and the Declaratory Judgment Act. The Government also moves to dismiss the Plaintiffs' Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which

Gavigan v. Com'r.I.R.S., Not Reported in F.Supp.2d (2007)
2007 WL 1238651, 99 A.F.T.R.2d 2007-2501, 2007-1 USTC P 50,506

Case 3:14-cv-00928-JCH   Document 21-3   Filed 10/31/14   Page 11 of 31

relief can be granted. Because the Government has only argued the jurisdictional issues in its memorandum in support of its motion, the Court, reading the papers in the light most favorable to the Plaintiffs and in deference to their pro se status, declines to review their claims for failure to state a claim upon which relief can be granted.

Before discussing the issues raised by the motion to dismiss, it must be stated that a fundamental aspect of Plaintiffs' position in this case is without merit. Plaintiffs assert in their opposition memorandum that they are nontaxpayers and as such are not liable for federal income taxes. (Pls.' Mem. at 4–5, 8–13, 14–15.) They further argue that the tax system is voluntary.(*Id.* at 9.) They argue, the payment of income taxes is "not optional," *United States v. Schiff,* 876 F.2d 272, 275 (2d Cir.1989); *see United States v. Gerads,* 999 F.2d 1255, 1256 (8th Cir.1993) (rejecting argument that payment of income taxes is voluntary), and there is no question that all citizens working in the United States are required to pay taxes. *See*26 U.S.C. §§ 1, 1441(a), (b); 26 C.F.R. § 1.1–1 (2007); *Schiff v. United States,* 919 F.2d 830, 832–33 (2d Cir.1990); *United States v. Drefke,* 707 F.2d 978, 981 (8th Cir.1983) (stating that claim of immunity from IRS jurisdiction as "nontaxpayer" is "totally without arguable merit"); *Bey v. City of New York Dep't of Corr.,* No. 97 Civ. 4866(RPP), 1997 WL 576090, at * 2 (S.D.N.Y. Sept.17, 1997).

**A. Sovereign Immunity**
 **\*4**  The Government contends that the Court lacks subject matter jurisdiction over Plaintiffs' claims against the United States because they are barred by sovereign immunity. Under well-established principles of sovereign immunity, claims against the United States and its agencies are barred unless sovereign immunity has been "unequivocally" waived by statutory text, *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), or the United States consents to be sued, in which case " 'the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (*quoting United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). Moreover, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957) (citing *Sherwood,* 312 U.S. at 590–91).

As an initial matter, the Court dismisses the Commissioner of the IRS and the IRS from this suit as improper defendants.

The Commissioner, as a federal official, may be subjected to suit for damages in his personal capacity.*Akers v. United States,* 539 F.Supp. 831, 833 (D.Conn.1982), *aff'd,*718 F.2d 1084 (2d Cir.1983). Although the Plaintiffs name the Commissioner in the title of their Amended Complaint, they do not allege any actions taken by him or otherwise mention him in the body of their complaint or in their opposition to the Government's motion. Therefore, the Plaintiffs fail to state a claim against the Commissioner in his personal capacity. *Id.* (dismissing claims against the IRS Commissioner because the plaintiffs did not make any allegations against the Commissioner in their complaint). The IRS itself is an improper party to this action because Congress has not authorized suits in federal courts against the Department of Treasury. *See Blackmar v. Guerre,* 342 U.S. 512, 151, 72 S.Ct. 410 (1952) (holding that Congress must give express authorization in order for an agency to be sued in its own name); *Posey v. U.S. Dep't of Treasury–I.R.S.,* 156 B.R. 910, 917 (W.D.N.Y.1993) (citation omitted); *Clegg v. U.S. Treasury Dep't,* 70 F.R.D. 486, 488–89 (D.Mass.1976) (citation omitted). Actions against the IRS are deemed actions against the United States, *Posey,* 156 B.R. at 917; *Dubay v. I.R.S.,* Civ. No. 3:96cv1399 (AHN), 1997 WL 76577, at *4 (D.Conn. Feb. 7, 1997), and so the United States remains the sole Defendant in this action. The sovereign immunity of the United States has been expressly waived in several instances; each waiver, as it relates to Plaintiffs' claims, will be addressed in turn below.

*1. Erroneous or Illegal Tax Assessment and Collection Claims (Counts I and II)*
Plaintiffs contend that they are entitled to a refund of the $3,340.45 levied from their Fleet bank account for tax year 1998, an abatement of the unpaid portions of their liability for tax years 1998–2001, and a refund for their overpayment for tax years 2003–2005. (*See* Am. Compl. ¶¶ 23–24, 30, 71–80, 82–88, Pls.' Ex. G, V, W, X, Y.) The Government moves to dismiss these claims for lack of subject matter jurisdiction. Taxpayers have federal statutory rights to challenge certain erroneously or illegally assessed taxes in federal court.Section 1346 of Title 28 of the United States Code gives district courts jurisdiction over:

> **\*5**  [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority

or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

28 U.S.C. § 1346(a)(1). Although Section 1346 appears to give broad power to the district courts to hear actions brought by taxpayers to recover payments on allegedly erroneous, illegal or wrongfully assessed or collected taxes, several restrictions limit a taxpayer's independent right to bring a refund suit in federal court. *First,* 26 U.S.C. § 7422(a) requires that a taxpayer must file a "claim for refund or credit" with the IRS before bringing suit in district court. In addition, a taxpayer cannot file suit against the IRS "before the expiration of 6 months from the date of filing the claim," 26 U.S.C. § 6532(a)(1); *see also Harriman v. I.R.S,* 233 F.Supp.2d 451, 459 (E.D.N.Y.2002) ("a claimant must give the Internal Revenue Service at least six months to process a claim prior to commencing suit in federal court"), and a taxpayer must pay the full amount of the assessment before he may challenge its validity in an action under § 1346(a)(1). *Flora v. United States,* 362 U.S. 145, 177, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960) ("correctly construed, [§ 1346(a)(1) ] requires full payment of the assessment before an income tax refund suit can be maintained in a Federal District Court"); *see also United States v. Forma,* 42 F.3d 759, 763 (2d Cir.1994).

Plaintiffs' first claim for a refund of the $3,340.45 levied from their Fleet bank account is dismissed for several reasons. First, Plaintiffs have not paid their tax liability in its entirety; Plaintiffs have only paid $3,340.45 of a tax liability that exceeds $60,000. (*See* Pls.' Ex. A–1, A–2, A–3, B, C, D, E.) Until Plaintiffs have paid the full amount of the tax liability assessed, the Court lacks jurisdiction to hear the case, and their claim for a refund must be dismissed. *Forma,* 42 F.3d at 763. Plaintiffs' claim for a refund also appears to be invalid because they filed the wrong form. In order for a claim for refund to be valid, it must satisfy the requirements imposed by statute and regulation. *Dubay v. Scott,* No. CIV. 3:98–0029(DJS), 1998 WL 1035429, at *3 (D.Conn. Sept.30, 1998). One such regulation requires the refund claim to be filed on the correct IRS form. *Id.* (citation omitted). A claim for a refund of an allegedly illegally assessed or collected tax arising out of a "1040" or "1040A" income tax must be filed on IRS Form 1040X, 26 C.F.R. § 301.6402–3, whereas a claim for a refund of taxes other than income tax must be filed on IRS Form 843. 26 C.F.R. § 301.6402–2(c); *see also Dubay,* 1998 WL 1035429, at *3. Plaintiffs filed a claim for refund of $3,340.45 on IRS Form 843 specifying the type of tax to be refunded as a "1040A" tax. (Pls.' Ex. G.) Because

Plaintiffs should have filed their income tax refund claim using IRS Form 1040X rather than IRS Form 843, their claim for a refund is invalid.

**\*6** Moreover, the Court lacks jurisdiction because Plaintiffs failed to wait the requisite six months before bringing suit. While statute of limitations defenses are often reviewed in the Second Circuit pursuant to Fed.R.Civ.P. 12(b)(6) as an element of a claim, statutes of limitation are jurisdictional in tax cases. *Harriman,* 233 F.Supp.2d at 457; *see also United States v. Dalm,* 494 U.S. 596, 608, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990). Plaintiffs submitted their claim for a refund on April 30, 2006 (Pls.' Ex. G), and so they should have waited until October 31, 2006 in order to comply with the six-month waiting period required by 26 U.S.C. § 6532(a)(1). However, Plaintiffs commenced this action on June 20, 2006, and filed their Amended Complaint on October 11, 2006. Because both complaints were filed before the requisite six-month waiting period, the Court lacks subject matter jurisdiction over Plaintiffs' action for refund of their $3,340.45 payment. Plaintiffs' February 9, 2006 letter titled "Release of Liens/Levy; Request for Refund/Abatement of Improper Assessments or Liability; Attempt to Exhaust Administrative Remedies" (Pls.' Ex. T.) could be viewed as an "informal request" for a refund to satisfy the six-month waiting period. *See Forma,* 42 F.3d at 767 n. 13 ("an informal claim is sufficient to satisfy the statutory prerequisite of a timely administrative claim found in 26 U.S.C. § 7422(a)" (citation and internal quotations omitted)). To be considered a satisfactory informal claim, the claim "must at least alert the IRS that the taxpayer seeks a refund and must also indicate the grounds upon which the taxpayer's claim is based." *Id.* (citations omitted). Reviewing the February 9th letter liberally, the Court may consider it an informal request because it clearly states that it is a "request for a refund" and explicitly refers to 27 U.S.C. §§ 1346 and 7422. (Pls.' Ex. T.) Nevertheless, even if it were to consider this letter an informal request that started the six-month waiting period earlier and saved the timing of Plaintiff's Amended Complaint, the Court still lacks subject matter jurisdiction because Plaintiffs did not pay their tax liability in full prior to filing this suit and because they did not use the correct forms when filing a refund for the $3,045 levy against Fleet Bank.

Plaintiffs' second claim against the IRS to abate the erroneously assessed taxes for years 1998–2001 is also dismissed. Congress prohibits taxpayers from filing claims for abatement of taxes erroneously or illegally assessed. 26 U.S.C. § 6404(b); *see also Bax v. C.I.R.* 13 F.3d

54, 58 (2d. Cir.1993) (holding § 6404(b)"expressly bars abatement claims predicated on the illegality of income tax assessments"). Accordingly, the Plaintiffs' claim for abatement of the unpaid portions of their tax liability (Count II) is hereby dismissed.

However, Plaintiffs' claim for a refund for their alleged overpayment of taxes for tax years 2003–05 is not dismissed because the Court is unable to determine at this time whether the Plaintiffs filed a timely request for a refund of these overpayments. Section 6511(a) provides:

> *7 [A c]laim for credit or refund of an overpayment of any tax ... shall be filed by the taxpayer *within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later,* or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.

26 U.S.C. § 6511(a) (emphasis added). In their Amended Complaint, Plaintiffs simply state that they made a "timely request for refund of an overpayment" (Am.Compl.¶¶ 76, 78, 80), but they have not attached any documents or letters specifically addressing the 2003, 2004, and 2005 overpayments. For purposes of this motion and in deference to Plaintiffs' pro se status, the Court accepts the statements made on the face of the complaint that Plaintiffs have fulfilled the statutory requirements for the refund of overpayments for tax years 2003–2005. Thus, the Government's motion to dismiss Plaintiffs' overpayment claims for tax years 2003–2005 (Count I) for lack of subject matter jurisdiction is denied.

### 2. Wrongful Levy Claim (Count III)

Defendants also move to dismiss Plaintiffs' wrongful levy claim brought pursuant to 26 U.S.C. § 7426. Plaintiffs allege that, pursuant to 26 U.S.C. § 6343(b)(1), they requested that the Government release levies and return property wrongfully imposed and collected. (Am.Compl.¶¶ 90–92.) If an individual believes that a levy against him or her was wrongful, his or her only recourse is to seek administrative review under 26 U.S.C. § 6343(b) within nine months or file suit in federal district court under § 7426(a)(1) within the same amount of time. *See United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 736, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).Section 7426 only waives the government's

sovereign immunity, however, for a person "other than the person against whom is assessed the tax out of which the levy arose [.]"26 U.S.C. § 7426(a)(1). The statute is strictly construed in order to preclude a waiver of sovereign immunity where the action is brought by the taxpayer. *Soffer v. United States,* No. 01 Civ. 0945(KMW) THK, 2002 WL 741653, at * 4 (S.D.N.Y. Mar.20, 2002); *see also Dubay,* 1998 WL 1035429, at *4. Accordingly, the United States has not consented to a wrongful levy action brought by Plaintiffs in federal district court, and so Plaintiffs' wrongful levy action (Count III) is dismissed.

### 3. Section 7432 Claim for Failure to Release a Lien (Count IV)

Plaintiffs allege that an unknown officer or employee of the IRS failed to release a lien pursuant to 26 U.S.C. § 6325(a)(1) in violation of 26 U.S.C. § 7432(a). (Am.Compl.¶¶ 4, 94.) However, unlike in wrongful levy actions, Congress has expressly waived sovereign immunity for taxpayers alleging that an employee or official of the IRS did not release a lien pursuant to § 6325(a)(1).26 U.S.C. § 7432(a). The Court accordingly has jurisdiction over Plaintiffs' § 7532 claim. The Government, presumably, moves to dismiss the claim pursuant to Rule 12(b)(6). However, since the Government did not brief the issue and makes only passing references to dismissing all of Plaintiffs' claims under Rule 12(b)(6), the Court will not grant Defendant's motion to dismiss Plaintiffs' § 7432(a) claim at this time.

### 4. Section 7433 Claim for Unauthorized Collection Actions (Count V)

*8 Plaintiffs also bring a claim for unauthorized collection of taxes by individual IRS agents (Count V), alleging that IRS employees Susan Meredith, C. Sherwood, Jane Finnegan, R.M. Connolly, Susan Hansen, and Ronald Johnson violated 26 U.S.C. § 6325 by issuing unsupportable NFTLs and NOLs. (*See* Am. Compl. ¶ 98.) The United States consents to be sued by a taxpayer in district court in actions relating to the collection of federal taxes if "any officer or employee of the Internal Revenue Service recklessly or intentionally, or by reason of negligence disregards any provision of this title[.]"26 U.S.C. § 7433(a). In order to bring a claim under § 7433 in district court, a plaintiff must first exhaust her administrative remedies or six months must have elapsed since she filed her administrative claim. *See*26 U.S.C. § 7433(d)(1); 26 C.F.R. § 301.7433–1(e)(1); *Roberts v. I.R.S.,* 468 F.Supp.2d 644, 650 (S.D.N.Y.2006) ("failure to comply with the regulation deprives the federal district court of

2007 WL 1238651, 99 A.F.T.R.2d 2007-2501, 2007-1 USTC P 50,506

jurisdiction" (citing *Stephens v. United States,* 437 F.Supp.2d 106, 109 (D.D.C.2006))). Plaintiffs allege that the IRS has not responded to their claim made in a letter dated February 9, 2006, titled "Release of Liens/Levy; Request for Refund/Abatement of Improper Assessments or Liability; Attempt to Exhaust Administrative Remedies."(Am.Compl.¶¶ 68, 69.) Therefore, because no final agency decision exists for the court to review, Plaintiffs could not file a claim in this court until six months after they filed their administrative claim with the IRS. Plaintiffs filed this action on June 20, 2006, only four and a half months after filing their IRS claim. Accordingly, Plaintiffs failed to exhaust their administrative remedies on their § 7433 claim for the unauthorized collection of taxes, and so Count V is hereby dismissed.

### 5. Common Law Tort Claims

Plaintiffs' common law tort claims of fraud, negligence, and intentional infliction of emotional distress must also be dismissed for lack of subject matter jurisdiction. Although the Federal Torts Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.,* provides an express waiver of sovereign immunity for the tortious acts or omissions of government employees acting within the scope of their office or employment, it specifically excludes tort claims "arising in respect to the assessment or collection of any tax." 28 U.S.C. § 2680(c). Because Plaintiffs' tort claims are based on the wrongful collection and/or assessment of taxes (Am.Compl.¶¶ 101–115, 120–124), the Court lacks subject matter jurisdiction over them. *See Weiner v. I.R.S.,* 986 F.2d 12, 13 (2d Cir.1993); *Webb v. Smith,* No. 97 CIV. 0787(MGC), 1997 WL 438794, at *2–3 (S.D.N.Y. Aug.4, 1997). Thus, Plaintiffs' tort claims (Counts VI, VII, and IX) are hereby dismissed.

### B. Anti–Injunction Act and Declaratory Judgment Act

Although the Plaintiffs do not explicitly ask for an injunction or for a declaratory judgment, the Plaintiffs' Amended Complaint, read in conjunction with their opposition memorandum, may be interpreted to request injunctive and/or declaratory relief. The Government moves to dismiss on the grounds that, to the extent Plaintiffs seek injunctive or declaratory relief, their claims are barred by the Anti–Injunction Act and/or the Declaratory Judgment Act.

**\*9** The Anti–Injunction Act provides in relevant part: "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). The purpose of the Act is both to protect the "Government's need to assess and collect taxes as

expeditiously as possible with a minimum of preenforcement judicial interference and to require that the legal right to the disputed sums be determined in a suit for refund." *Randell v. United States,* 64 F.3d 101, 106 (2d Cir.1995) (quoting *Bob Jones Univ. v. Simon,* 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974)) (internal quotations omitted). However, a taxpayer may sue to restrain the assessment or collection of a tax where he or she shows: "(1) that 'it is clear that under no circumstances could the Government ultimately prevail' on the tax liability and (2) that 'equity jurisdiction otherwise exists' because the taxpayer would suffer irreparable injury if collection were effected." *Randell,* 64 F.3d at 106–07 (quoting *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962)). Furthermore, the court must "take the view of the facts that is most liberal to the Commissioner, not to the taxpayer seeking injunctive relief." *Randell,* 64 F.3d at 107 (citations omitted). In the case at bar, Plaintiffs have made no allegations to satisfy this standard. Plaintiffs make no showing anywhere in their complaint or their brief that under no circumstances could the government prevail in this matter. Moreover, the Plaintiffs have not alleged or implied that the monies levied or the lien on Plaintiffs' property would cause them "irreparable harm." Because nothing in Plaintiffs' complaint of brief could be interpreted as satisfying either exception to the Anti–Injunction Act, any claim by Plaintiffs for injunctive relief is hereby dismissed.

The Declaratory Judgment Act expressly precludes federal courts from granting declaratory relief in cases "with respect to federal taxes." 28 U.S.C. § 2201(a). "Thus, whether or not that Act waives the sovereign immunity of the United States with respect to other types of actions, it explicitly excludes from any such waiver the power to declare rights or obligations with respect to federal taxes." *S.E.C. v. Credit Bancorp, Ltd.,* 297 F.3d 127, 137 (2d Cir.2002). Because Plaintiffs' claims all relate to the assessment or collection of federal taxes, they are dismissed to the extent they request declaratory relief.

### C. Constitutional Claims

Although Plaintiffs do not clearly state a count alleging any constitutional violations, they make statements in their Amended Complaint which may be construed to allege deprivations of their property in violation of the Fourth, Fifth, and Fourteenth Amendments. (Am.Compl.¶¶ 10, 12, 20–22). To the extent Plaintiffs bring claims for violations of their constitutional rights to due process of law and to be free from unreasonable seizures, they are dismissed for failure

to state a claim upon which relief can be granted. Plaintiffs apparently claim that their due process rights were violated because no court ordered that the property in their bank accounts be conveyed to the IRS. (*I d.* ¶ 9.) Plaintiffs cite 26 U.S.C. § 7323, relating to judicial action to seize and enforce property subject to forfeiture, to support their allegation that the IRS failed to follow procedures mandated by statute with respect to the assessment and collection of income taxes. (*Id.* ¶ 11.) However, there is no requirement that the IRS or the United States obtain a court order before it can assess a tax, file a notice of federal tax levy, or begin collection actions, unless they are imposing a levy on a personal residence or entering private property for the purposes of collecting taxes. Neither of those exceptional circumstances apply to the case at bar. Plaintiffs further allege that the NOL issued to Fleet was defective because it was not accompanied by warrants of distraint or a notice of seizure. (*Id.* ¶¶ 20, 22.)However, warrants of distraint are no longer required under the statute authorizing the IRS to collect unpaid tax by a levy on property. *See* 26 U.S.C. § 6331(a); *see also Nat'l Bank of Commerce,* 472 U.S. at 721, 105 S.Ct. 2919, 86 L.Ed.2d 565 ("The constitutionality of the levy procedure ... 'has long been settled.' " (*quoting Phillips v. Comm'r,* 283 U.S. 589, 595, 51 S.Ct. 608, 75 L.Ed. 1289 (1931))); *Celauro v. United States,* 411 F.Supp.2d 257, 264–65 (E.D.N.Y.2006). Plaintiffs have therefore failed to state any constitutional claim upon which relief can be granted, and any due process or unreasonable seizure claims raised by Plaintiffs are hereby dismissed.

## IV. CONCLUSION

**\*10** For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 19] is **granted in part** and **denied in part.** Counts II, III, V, VI, VII, and XI are hereby dismissed.

SO ORDERED.

**Parallel Citations**

99 A.F.T.R.2d 2007-2501, 2007-1 USTC P 50,506

Footnotes

1    Plaintiffs describe the NFTL was "undated." (Am.Compl.¶ 13.) However, the NFTL included in Exhibit B is dated "June 10, 2004"; therefore the Court will use this date. (*See* Pls.' Ex. B.)

2    In the Amended Complaint, Plaintiffs describe the second NFTL as "undated." (Am.Compl.¶ 16.) However, the NFTL included in Exhibit D is dated "November 4, 2005"; therefore the Court will use this date. (*See* Pls.' Ex. D.)

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:14-cv-00928-JCH    Document 21-3    Filed 10/31/14    Page 16 of 31

Mayo v. U.S., Not Reported in F.Supp. (1982)

1982 WL 1652, 50 A.F.T.R.2d 82-5192, 82-2 USTC P 9488

1982 WL 1652
United States District Court; W.D. Louisiana,
Monroe Division.

Ray Cody Mayo

v.

United States of America.

Civil Action No. 81-2125    |    5/10/82

STAGG, District Judge.

**Memorandum Ruling**

**\*1** Plaintiff filed this action on November 20, 1981, seeking a refund of an assessed tax penalty and injunctive relief against a future assessment of penalties. Plaintiff also seeks a declaration that 26 U. S. C. § 6694 is unconstitutional. Defendant has filed a motion to dismiss, asserting that this court lacks jurisdiction over this action. Plaintiff has not filed a response to the government's motion.

Two key factual points in plaintiff's complaint support the government's position. First, plaintiff has not paid the entire penalty. Second, this case was filed almost ten months after plaintiff paid 15 per cent of the penalty under § 6694(c).

> *Flora v. United States* [60-1 USTC P 9347], 1960, 362 U. S. 145, 80 S. Ct. 630, 4 L. Ed. 2d 623,*affirming,* 1958, [58-2 USTC P 9606], 357 U. S. 63, 78 S. Ct. 1079, 2 L. Ed. 2d 1165, established that the District Court has jurisdiction only if the full assessment has been paid. Although *Flora* concerned income tax, the statute construed, 28 U. S. C. § 1346(a)(1), applies to "any internal-revenue tax", . . . .

*Horne v. U. S.*[75-2 USTC P 13,096], 519 F. 2d 51, 52 (5th Cir. 1975). Thus, this court lacks jurisdiction over the refund action unless the exception contained in § 6694(c) applies. Sections 6694(c)(1) and (2) provide that upon payment of 15 per cent of the assessed penalty against the tax preparer, the preparer may bring a suit in district court for a determination of his liability for the penalty. However, such suit must be

brought "within 30 days after the day on which his claim for refund of any partial payment of any penalty under subsection (a) or (b) is denied (or, if earlier, within 30 days after the expiration of 6 months after the day on which he filed the claim for refund), . . ." Section 6694(c)(2). Thus the plaintiff, under his allegations, had to bring suit prior to August 28, 1981, but failed to do so. Therefore, this court lacks jurisdiction over the refund action.

Given the conclusion that § 6694(c)(2) bars this action, it is not surprising that plaintiff seeks a declaration that the provision is unconstitutional. However, "[i]t is also well settled that a declaratory judgment cannot be issued in a tax case." *Horne, supra,* at 52. As to the requested injunctive relief, 26 U. S. C. § 7421(a) bars such relief unless plaintiff has placed himself within one of the exceptions to the statute. *Smith v. Rich* [82-1 USTC P 9206], 667 F. 2d 1228, 1230 (5th Cir. 1982). None of the statutory exceptions is applicable, nor have any been urged by plaintiff. There is possibly one judicial exception to § 7421(a), but it is inapplicable because "equity jurisdiction must otherwise exist, in the sense that the taxpayer will suffer irreparable injury for which no legal remedy is adequate, . . . but not including the injury that might result merely from the collection of the taxes themselves, . . ." *Id.* at 1231. It is plain from the face of plaintiff's complaint that equity jurisdiction does not otherwise exist, and that § 7421(a) bars the award of any injunctive relief in this case.

**\*2** In summary, plaintiff's complaint itself shows that this court is without jurisdiction over the case and fails to state a cause of action for which relief can be granted. This conclusion is reinforced by plaintiff's failure to respond to the defendant's motion. Accordingly, defendant's motion to dismiss is GRANTED.

**Order**

For the reasons given in the foregoing Memorandum Ruling,

IT IS ORDERED that the complaint of plaintiff, Ray Cody Mayo, be DISMISSED without prejudice.

**Parallel Citations**

50 A.F.T.R.2d 82-5192, 82-2 USTC P 9488

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

1981 WL 1745, 47 A.F.T.R.2d 81-1112, 81-1 USTC P 9289

1981 WL 1745
United States District Court; D. Oregon.

John J. O'Keefe, Plaintiff

v.

United States of America, Defendant.

Civil No. 80-6316-ME    |    1/2/81

HOGAN, Magistrate.

**Findings and Recommendation**

 **\*1**  Plaintiff filed this action pursuant to 28 U. S. C. § 1346(a) to determine his liability for a $100 penalty assessed against him by the Internal Revenue Service [IRS], in connection with his preparation of Chester and Maxine Pope's tax return for the 1976 tax year. Plaintiff paid $15.00 of this assessment, and now seeks a refund in that amount.

Defendant denies that this court has jurisdiction to grant such a refund, and moves for summary judgment, pursuant to Fed. R. Civ. P. 56.

A federal court lacks jurisdiction under 28 U. S. C. § 1346(a) unless plaintiff has discharged the full amount of the assessed penalty. *Flora v. United States* [60-1 USTC P 9347], 362 U. S. 145 (1960). Congress provided a specific exception to the mandate of *Flora*, however, in 26 U. S. C. § 6694(c). An action may now be brought to determine the liability for such a penalty if: (1) plaintiff has paid not less than 15 percent of

the penalty; and (2) the action is filed within 30 days of the day on which a claim for refund was denied by the IRS, or – if earlier – within 30 days of the expiration of six months after the day on which the claim to the IRS was filed. 26 U. S. C. § 6694(c)(1) and (2).

Plaintiff has paid 15 percent of the penalty assessed by the IRS. He filed his claim for refund with the IRS on February 11, 1980, and it was denied on October 1, 1980. Pursuant to 28 U. S. C. § 6694(c)(2), this court has jurisdiction of this action if it was filed within six months and 30 days after that claim was filed, or, under the above facts, if it was filed by September 11, 1980. The present action was not filed until October 1, 1980. Therefore, this court lacks jurisdiction to adjudicate plaintiff's claim for a refund.

Defendant's motion for summary judgment should be granted and this action dismissed.

**Order**

After review of the file in this case, I adopt the magistrate's finding and recommendation.

Defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing this action.

**Parallel Citations**

47 A.F.T.R.2d 81-1112, 81-1 USTC P 9289

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Sacher v. U.S., Not Reported in F.Supp. (1988)

Case 3:14-cv-00928-JCH    Document 21-3    Filed 10/31/14    Page 18 of 31

1988 WL 572
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Thomas SACHER, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV–87–617E.    |    Jan. 4, 1988.

**Attorneys and Law Firms**

John N. Moore, Solon, Ohio, for plaintiff.

Carole Thomas, Tax Division, U.S. Dept. of Justice, Washington, D.C., for defendant.

**MEMORANDUM and ORDER**

ELFVIN, Senior District Judge.

*\*1* The defendant has moved to dismiss for lack of subject matter jurisdiction this action to recover penalties imposed and paid under the Internal Revenue Code, 26 U.S.C. § 6703(c)(2). The defendant asserts there is no subject matter jurisdiction pursuant to that section because the cause of action with respect to the 1983 tax year was not filed timely and that with respect to 1984 the plaintiff filed too early. The plaintiff had informed this Court, prior to the return date of said motion, that he no longer opposed it. This Court, however, feels it is appropriate to address the matter briefly.

Pursuant to section 6703(c)(2) a taxpayer must, within thirty days after the denial of his or her claim for refund of the required partial payment of any penalty or (if earlier) "within 30 days after the expiration of 6 months after the day on which he filed his claim for refund," file his suit in the district court to determine his liability for such penalty. The plaintiff filed this action to determine the liability imposed upon him for the tax years 1983 and 1984. These two years must be dealt with separately.

On October 6, 1986 a notice and demand for payment of penalty from the Internal Revenue Service ("the IRS") was mailed to the plaintiff and on November 3, 1986 he filed his claim for refund with the IRS for the 1983 tax year. (Complaint, Exhibits A–2 and B–2.) This claim had never been denied and, therefore, under section 6703(c)(2), the plaintiff had to file this action within 30 days after six months after the day on which he filed his claim. This six-month period began to run November 3, 1986, the date on which the plaintiff's claim for refund was mailed and effectively filed for purposes of the Internal Revenue Code. 26 U.S.C. § 7502(a)(1). The period ended May 3, 1987 and the plaintiff had until June 2, 1987 to file his action. The plaintiff's action was not filed until June 4, 1987 and therefore was not timely. Accordingly, this Court lacks subject matter jurisdiction to entertain it. *See, Scull v. United States,* 585 F.Supp. 956, 959 (E.D.Va.1984).

On December 1, 1986 the IRS mailed to the plaintiff a notice of penalty for the 1984 tax year and a demand for its payment and on December 19, 1986 he filed his claim for refund with the IRS (Complaint, Exhibits A–1 and B–1).[1] This claim has yet to be denied and, therefore under section 6703(c)(2), an action for relief in the district court could not be filed by the plaintiff until six months after the day on which he filed his claim for refund or June 20, 1987, the first day of the thirty-day period following the six-month hiatus. The Complaint was filed June 4, 1987 and thus was not within section 6703(c)(2). The plaintiff, apparently aware of the problem, had filed a second claim in this Court for the 1984 penalty. That second claim, however, does not affect this motion. Accordingly, the Complaint was not filed within the time limits prescribed and this Court, therefore, lacks subject matter jurisdiction over this claim.

*\*2* Accordingly, it is hereby ORDERED that defendant's motion to dismiss is granted and that the Complaint is dismissed.

**Footnotes**

1    No point is made—or here considered—concerning the inadequacy *vel non* of the partial payment made by the plaintiff relative to 1984. The referenced exhibits show the penalty to be $7,000 and 15% thereof is $1,050. The plaintiff appears to have paid only $150.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

T.C. Summ.Op. 2013-62

PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b), THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.
United States Tax Court.

SEAN McALARY LTD, INC., Petitioner
v.
COMMISSIONER of INTERNAL REVENUE, Respondent.

No. 21068−11S.   |   Aug. 12, 2013.

**Synopsis**
**Background:** S corporation petitioned under small-tax-procedure for redetermination of employment tax liabilities.

**Holdings:** The Tax Court, Guy, Special Trial J., held that:

[1] amount of $240,000 distribution to S corporation's sole officer to be recharacterized as reasonable compensation subject to employment tax was $83,200, and

[2] corporation was liable for additions to tax for failure to timely file employment tax returns and failure to timely deposit employment taxes.

Decision for IRS.

West Headnotes (4)

[1]    **Internal Revenue**
         Jurisdiction
        Tax Court has jurisdiction to review certain determinations made by the IRS regarding employment status, or worker classification, and to determine the proper amount of employment tax arising from such determination. 26 U.S.C.A. § 7436(a).

        Cases that cite this headnote

[2]    **Internal Revenue**
         Business or Occupation in General
        Amount of $240,000 distribution to S corporation's sole officer and real estate broker to be recharacterized as reasonable compensation subject to employment tax was $83,200, in light of wage statistics and market conditions, not $24,000 set forth in remuneration agreement between corporation and officer, where officer single-handedly conducted corporation's daily business operations, making all management decisions, engaging in real estate sales transactions on corporation's behalf as both broker and sales agent, and earning commissions that represented most of corporation's gross receipts. 26 U.S.C.A. §§ 3111(a, b), 3301; Rev. Rul. 74–44, 1974–1 C.B. 287.

        Cases that cite this headnote

[3]    **Internal Revenue**
         Occupation or Business Taxes
        In determining amount of distribution to S corporation's shareholder that may be recharacterized as reasonable compensation subject to employment tax, whether an amount of compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case, and no single factor is decisive. 26 U.S.C.A. §§ 3111(a, b), 3301; Rev. Rul. 74–44, 1974–1 C.B. 287.

        Cases that cite this headnote

[4]    **Internal Revenue**
         Reasonable Cause
        S corporation did not act with reasonable cause and in good faith based on reliance on advice of tax professional, and thus corporation was liable for additions to tax for failure to timely file employment tax returns and failure to timely deposit employment taxes; other than testimony from corporation's sole officer that he generally was impressed with accountant, there was no evidence that corporation investigated accountant's background or qualifications or that corporation otherwise confirmed that accountant was competent professional with sufficient expertise to justify reliance on his advice. 26

U.S.C.A. §§ 6651(a)(1), 6656(a); 26 C.F.R. § 301.6651–1(c)(1).

Cases that cite this headnote

**Attorneys and Law Firms**

Sean P. McAlary (an officer), for petitioner.

Mark H. Pfeffer, for respondent.

**SUMMARY OPINION**

GUY, Special Trial Judge:

**\*1** This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed. [1] Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

The petition in this case was filed in response to a notice of determination of worker classification (notice of determination) issued to Sean McAlary Ltd, Inc. (petitioner), pursuant to section 7436. The notice of determination concerns employment tax liabilities arising under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) for quarterly periods ending in 2006. [2] Attached to the notice of determination is a schedule setting forth petitioner's liabilities for employment taxes for quarterly periods ending in 2006 as follows:

| Tax period ending | Old age, survivor, disability insurance | Hospital insurance | Income tax withholding | Federal unemployment tax |
|---|---|---|---|---|
| Mar. 31 | $1,163.12 | $272.02 | $402 | —— |
| June 30 | 3,124.80 | 730.80 | 1,080 | —— |
| Sept. 30 | 1,302.00 | 304.50 | 450 | —— |
| Dec. 31 | 2,569.28 | 751.10 | 1,110 | $434 |
| Total | 8,159.20 | 2,058.42 | 3,042 | 434 |

Respondent also determined that petitioner is liable for additions to tax and penalties for quarterly periods ending in 2006 as follows:

| Tax period ending | Additions to tax | | Penalty |
|---|---|---|---|
| | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6656 |
| Mar. 31 | $413.36 | $459.29 | $183.71 |
| June 30 | 1,110.51 | 1,233.90 | 493.56 |
| Sept. 30 | 462.71 | 514.13 | 205.65 |
| Dec. 31 | 996.84 | 1,107.60 | 486.44 |

Petitioner filed a timely petition for review of respondent's determination. At the time the petition was filed, petitioner's principal place of business was in California.

After concessions, [3] the issues remaining for decision are: (1) the amount of Sean P. McAlary's compensation that is subject to employment taxes; (2) whether petitioner is liable for additions to tax under section 6651(a)(1) for failing to file Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and Forms 941, Employer's Quarterly Federal Tax Return; and (3) whether petitioner is liable for penalties under section 6656 for failing to make timely deposits of FICA and FUTA taxes.

### Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

### I. Sean P. McAlary

Mr. McAlary earned a bachelor's degree with a major in business administration from the University of Southern California, and he spent many years working in the computer technology industry. In 2002, at the age of 54, Mr. McAlary obtained a California real estate sales license and began to earn commissions selling residential real estate in southern California. He concluded that earning real estate sales commissions would be a good way to generate income to set aside for retirement, and in 2004 he obtained a California real estate broker's license.

### II. Sean McAlary Ltd, Inc.

 **\*2**  Mr. McAlary met Mark Botta, a tax return preparer with offices in Newport Beach, California, and Las Vegas, Nevada, at a business meeting. Mr. McAlary was impressed with Mr. Botta and hired him to provide business advice and services in connection with his emerging real estate activity. In 2003 Mr. McAlary, with Mr. Botta's assistance, organized petitioner as a corporation under the laws of the State of Nevada, and petitioner elected to be taxed under subchapter S of chapter 1 of the Code.

Minutes for petitioner's board of directors meeting held on April 1, 2004, state in relevant part as follows:

> Annual Compensation for Sean McAlary, President of the Corporation, shall be based on the number of Revenue Generating Real Estate Agents and Associate

> Brokers (Affiliates) associated with the Corporation. The Annual Base Compensation shall be $24,000 when the number of Affiliates is not more than ten (10). Annual Additional Compensation in the amount of $10,000 shall be earned for each increment of ten (10) Additional Affiliates. No Additional Compensation shall be earned for any partial increment of ten (10) Affiliates.

### III. Petitioner's Operations

Mr. McAlary was petitioner's president, secretary, treasurer, sole director, and sole shareholder. He also was the only person working for the firm that held a real estate broker's license. He managed all aspects of petitioner's operations, including recruiting and supervising sales agents, conducting real estate sales, procuring advertising, purchasing supplies, and maintaining basic books and records. Mr. McAlary often worked 12–hour days with few days off.

Mr. McAlary hoped to grow petitioner's operations by increasing the number of sales agents and associate brokers on petitioner's staff. He discovered, however, that many sales agents wanted to work for larger, established real estate brokerage firms. Petitioner's sales agents operated as independent contractors, and they earned between 60% and 85% of the sales commissions generated on real estate sales they initiated and closed, with petitioner retaining the balance. During 2006 Mr. McAlary supervised eight sales agents, four of whom generated sales commissions for petitioner that year.

Most of petitioner's gross receipts were attributable to sales commissions generated by Mr. McAlary, as opposed to petitioner's other sales agents. Petitioner reported gross receipts and net income for the calendar years 2004 and 2005 as follows:

| Year | Gross receipts | Net income |
|------|----------------|------------|
| 2004 | $376,453 | $122,605 |
| 2005 | 405,244 | 161,660 |

Mr. McAlary personally delivered petitioner's tax records for 2006 to Mr. Botta at his office in Las Vegas on March 8, 2007. Although he inquired over the ensuing months about the

### IV. Petitioner's Income Tax Return

progress being made in preparing the tax return, he received no response from Mr. Botta. Mr. Botta delivered petitioner's Form 1120S, U.S. Income Tax Return for an S Corporation, to Mr. McAlary in early December 2007.

**\*3** Mr. McAlary filed petitioner's Form 1120S on December 11, 2007. Petitioner reported gross receipts of $518,189, various deductions totaling $286,735, and net income of $231,454. Petitioner did not issue a Form W–2, Wage and Tax Statement, to Mr. McAlary, nor did it claim a deduction for any amount paid to Mr. McAlary as wages or compensation for services. During 2006 Mr. McAlary transferred a total of $240,000 from petitioner's account to his personal account.

Petitioner did not file Form 940 for 2006 or Form 941 for any quarterly period ending in 2006.

### V. *Mr. McAlary's Income Tax Return*
Mr. McAlary and his spouse filed a joint Form 1040, U.S. Individual Income Tax Return, on December 11, 2007. Mr. McAlary did not report any amount for wages or salaries on line 7 of the return, nor did he report or pay any self-employment tax during 2006. On Schedule E, Supplemental Income and Loss, Mr. McAlary reported a loss of $15,035 on Part I, Income or Loss From Rental Real Estate and Royalties, income of $200,877 on Part II, Income or Loss From Partnerships and S Corporations, and total income of $185,842 on Part V, Summary.

### VI. *Respondent's Expert Witness*
At trial the Court received in evidence an expert witness report prepared by Igor Ostrovsky, an employee in the Internal Revenue Service's engineering and valuation program.[4] Mr. Ostrovsky opined that, of the $240,000 that Mr. McAlary received from petitioner during 2006, $100,755 represented reasonable compensation, i.e., the fair market value of the services that Mr. McAlary performed for petitioner that year.

In computing Mr. McAlary's reasonable compensation for 2006, Mr. Ostrovsky first concluded that Mr. McAlary's primary job function was that of a real estate broker supervising real estate agents. He then consulted the California Occupational Employment Statistics Survey for 2006,[5] determined that the median wage for a real estate broker in southern California was $48.44 per hour,[6] and multiplied that amount by 2,080 hours (40 hours per week x

52 weeks per year)[7] to arrive at total annual compensation of $100,755.

In support of his conclusion that $100,755 represented reasonable compensation for Mr. McAlary's services during 2006, Mr. Ostrovsky compared petitioner's financial performance with that of its peers in the real estate industry.[8] He consulted the Risk Management Association Annual Statement Studies[9] and noted that petitioner's 44.7% profit margin for 2006 far surpassed the 21.9% average profit margin for the industry. As was noted at trial, however, the 44.7% profit margin that Mr. Ostrovsky cited did not account for petitioner's obligation to pay Mr. McAlary's reasonable compensation. Assuming Mr. McAlary's reasonable compensation is $100,755, as Mr. Ostrovsky suggests, petitioner's profit margin only slightly exceeded the industry average.

Mr. Ostrovsky further noted that compensation of $100,755 equaled 19.4% of petitioner's gross receipts of $518,189, and he opined that this level of compensation compared favorably with RMA statistics showing that officers/directors/owners at comparable real estate businesses were compensated in a range of 7% of net sales (25th percentile) to 18.9% of net sales (75th percentile), with a median of 11% of net sales.[10]

### *Discussion*

### I. *Employment Taxes*
**\*4** **[1]** Section 7436(a) vests the Court with jurisdiction to review certain determinations made by the Commissioner regarding employment status (worker classification) and to determine the proper amount of employment tax arising from such determination. *See Charlotte's Office Boutique, Inc. v. Commissioner,* 121 T.C. 89, 102–103, 2003 WL 21783383 (2003), *aff'd,*425 F.3d 1203 (9th Cir.2005).

Sections 3111 and 3301 impose FICA and FUTA employment taxes on employers in connection with wages paid to their employees. *See*secs. 31.3121(a)–1(b), 31.3306(b)–1(b), Employment Tax Regs. For Federal employment tax purposes an employee is defined in relevant part as any officer of a corporation. *See*sec. 3121(d)(1); *see also*sec. 3306(i). An officer who performs more than minor services for a corporation and who receives remuneration in any form for those services is considered an employee whose wages are subject to Federal employment taxes. Sec.

31.3121(d)–1(b), Employment Tax Regs.; *see Veterinary Surgical Consultants, P.C. v. Commissioner,* 117 T.C. 141, 144–145, 2001 WL 1242120 (2001), *aff'd sub nom.Yeagle Drywall Co., Inc. v. United States,* 54 Fed. Appx. 100 (3d Cir.2002).

In general, an S corporation shareholder is taxed on the shareholder's pro rata share of the corporation's income, regardless of whether the shareholder actually receives a distribution. Sec. 1366(a)(1). Where the shareholder is also an employee of the corporation, there is an incentive both for the corporation and for the employee/shareholder to characterize a payment to the employee/shareholder as a distribution rather than as compensation because only payments for compensation are subject to Federal employment taxes. *See*secs. 3111(a) and (b), 3301; *see also Durando v. United States,* 70 F.3d 548, 550 n. 5, 552 (9th Cir.1995) (a shareholder's share of an S corporation's income is not subject to self-employment tax). In such instances, the Commissioner may recharacterize a distribution as compensation in order to reflect the true nature of the payment. *See*Rev. Rul. 74–44, 1974–1 C.B. 287 ("dividends" paid to S corporation shareholders treated as reasonable compensation for services rendered and subjected to Federal employment taxes); *see also Veterinary Surgical Consultants, P.C. v. Commissioner,* 117 T.C. at 145–146.

## II. *Reasonable Compensation*

**[2]** The parties agree that Mr. McAlary was petitioner's employee within the meaning of section 3121(d) during 2006. Indeed, he performed substantial professional services for petitioner that year. The question presented is the value of those services and, more precisely, the amount to be treated as Mr. McAlary's compensation for purposes of computing petitioner's Federal employment tax liabilities.

As previously mentioned, respondent asserts that $100,755 of the $240,000 Mr. McAlary received from petitioner during 2006 should be treated as his wages. Respondent avers that Mr. McAlary, acting in his capacities as petitioner's sole officer and real estate broker, performed a variety of services that were essential to petitioner's operations and overall success.

**\*5** Petitioner contends that the Court should respect the remuneration agreement between Mr. McAlary and petitioner which set his annual base pay at $24,000 and provided for increased compensation if Mr. McAlary was able to recruit additional sales agents and associate brokers. Petitioner

further contends, with little elaboration, that in the light of petitioner's modest operations, Mr. McAlary's compensation should be measured by ranking petitioner in the 10th percentile of comparable real estate businesses in southern California.

We are not persuaded that the remuneration agreement represents a sound measure of the value of the services that Mr. McAlary provided to petitioner during 2006. We cast a skeptical eye on the agreement inasmuch as Mr. McAlary sat on both sides of the table when the agreement was executed, occupying the positions of both employer and employee. The agreement clearly was not the product of an arm's-length negotiation. *See Charles Schneider & Co. v. Commissioner,* 500 F.2d 148, 152 (8th Cir.1974), *aff'g*T.C. Memo.1973–130. Additionally, although the number of real estate sales agents and associate brokers that Mr. McAlary supervised is a factor to consider in determining his reasonable compensation, it is only one factor among many. Finally, there is no evidence in the record that petitioner actually paid Mr. McAlary any amount pursuant to the agreement, suggesting that it was forgotten, ignored, or adopted as mere window dressing.

**[3]** Courts have weighed various factors in assessing the reasonableness of compensation, including the employee's qualifications, the nature, extent, and scope of the employee's work, the size and complexity of the business, prevailing general economic conditions, the employee's compensation as a percentage of gross and net income, the employee/shareholder's compensation compared with distributions to shareholders, the employee/shareholder's compensation compared with that paid to nonshareholder/employees, prevailing rates of compensation for comparable positions in comparable concerns, and comparable compensation paid to a particular shareholder/employee in previous years where the corporation has a limited number of officers. *Charles Schneider & Co. v. Commissioner,* 500 F.2d at 151–152; *K & K Veterinary Supply, Inc. v. Commissioner,* T.C. Memo.2013–84, at *9–*10. Whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case, and no single factor is decisive. *Joly v. Commissioner,* T.C. Memo.1998–361, *aff'd without published opinion,*211 F.3d 1269 (6th Cir.2000).

During 2006 Mr. McAlary single-handedly conducted petitioner's daily business operations, making all management decisions while also engaging in real estate sales transactions on petitioner's behalf as both a broker and a sales

agent. Even though Mr. McAlary was relatively new to the real estate sales industry, the commissions that he earned as a sales agent and a broker represented most of petitioner's gross receipts. We recognize that petitioner's financial success was attributable in no small part to favorable real estate market conditions. Nevertheless, although petitioner's operation was modest and the number of agents that Mr. McAlary supervised was small, he was committed to the success of the operation as evidenced by his willingness to work long hours with few days off. Petitioner's profit margin during the year in issue slightly exceeded the average of its peers in the industry.

**\*6** Respondent's expert, Mr. Ostrovsky, opined that petitioner could have expected to pay $48.44 per hour, or $100,755 annually, to an individual in exchange for the various services that Mr. McAlary performed for the firm during 2006. Although the $48.44 hourly rate represents the median hourly wage for real estate brokers in southern California during the periods in issue, the portion of Mr. Ostrovsky's report purporting to reconcile his conclusion with the compensation practices of Mr. McAlary's industry peers was not persuasive.

Determining an employee's reasonable compensation is dependent upon a number of factors and is far from an exact science. Considering the totality of the facts and circumstances, including the pertinent wage and labor statistics cited in Mr. Ostrovsky's report, general market conditions, Mr. McAlary's somewhat limited experience, and petitioner's modest operations, we hold that an hourly rate of $40 (i.e., annual compensation of $83,200) represents reasonable compensation for the various services that Mr. McAlary performed for petitioner during 2006.

### III. *Additions to Tax and Penalties:* Sections 6651(a)(1) and 6656

**[4]** Respondent determined that petitioner is liable for additions to tax under section 6651(a)(1) for failing to file Forms 940 and 941 and for penalties under section 6656 for failing to make timely deposits of FICA and FUTA taxes.

Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return unless it is shown that such failure is due to reasonable cause and not due to willful neglect. The addition to tax is equal to 5% of the amount of the tax required to be shown on the return if the failure to file is not for more than one month. Sec. 6651(a)(1). An additional

5% is imposed for each month or fraction thereof in which the failure to file continues, to a maximum of 25% of the tax. *Id.* If a taxpayer exercised ordinary business care and prudence and was nonetheless unable to file the return within the date prescribed by law, then reasonable cause exists. Sec. 301.6651–1(c)(1), Proced. & Admin. Regs. "Willful neglect" means a "conscious, intentional failure or reckless indifference." *United States v. Boyle,* 469 U.S. 241, 245, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985).

Section 6656(a) imposes a penalty for failure to deposit any amount of tax with a Government depository. As relevant herein, the penalty is equal to 10% of the underpayment if the failure is for more than 15 days. Sec. 6656(b)(1)(A)(iii). As is true with respect to the addition to tax under section 6651(a)(1), a taxpayer may avoid a penalty under section 6656(a) if the taxpayer's failure to make a required deposit was due to reasonable cause and not willful neglect.

Mr. McAlary testified that he provided petitioner's tax information to petitioner's accountant, Mr. Botta, and that he counted on him to properly compute petitioner's tax liabilities. Reliance on the advice of a tax professional may establish reasonable cause and good faith. *See United States v. Boyle,* 469 U.S. at 250. Reliance on a tax professional, however, is not an absolute defense but merely a factor to be considered. *Freytag v. Commissioner,* 89 T.C. 849, 888, 1987 WL 45307 (1987), *aff'd,* 904 F.2d 1011 (5th Cir.1990), *aff'd,* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Whether reasonable cause exists when a taxpayer has relied upon a tax professional to prepare a tax return must be determined upon a review of all the facts and circumstances. *Neonatology Assocs., P.A. v. Commissioner,* 115 T.C. 43, 98, 2000 WL 1048512 (2000), *aff'd,* 299 F.3d 221 (3d Cir.2002). We have held that for a taxpayer to rely reasonably upon the advice of a tax professional, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Id.* at 99.

**\*7** Other than Mr. McAlary's testimony that he generally was impressed with Mr. Botta, there is no evidence that petitioner investigated Mr. Botta's background or qualifications or that petitioner otherwise confirmed that Mr. Botta was a competent professional who had sufficient expertise to justify reliance on his advice. Considering all

the facts and circumstances, we are not persuaded that petitioner exercised ordinary business care and prudence and was nonetheless unable to file Forms 940 and 941 by the date prescribed by law or unable to remit the proper amount of employment taxes to the Government. Consequently, we sustain respondent's determination that petitioner is liable for additions to tax under section 6651(a)(1) and penalties under section 6656(a) for the taxable periods in issue.

Consistent with the preceding discussion,

*Decision will be entered under Rule 155.*

**Parallel Citations**

2013 WL 4052429 (U.S.Tax Ct.)

Footnotes

1    Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect for 2006, and Rule references are to the Tax Court Rules of Practice and Procedure.

2    Sec. 7436(e) defines the term "employment tax" as any tax imposed by subtit. C, which encompasses secs. 3101 to 3510 (including FICA and FUTA taxes).

3    The parties agree that Sean P. McAlary was petitioner's employee throughout 2006 and that no relief is available to petitioner under the Revenue Act of 1978, Pub.L. No. 95–600, sec. 530, 92 Stat. at 2885, as amended. Further, pursuant to a telephone conference call that the Court held with the parties on July 1, 2013, respondent concedes that petitioner is not liable for additions to tax under sec. 6651(a)(2) for the taxable periods in issue.

4    Mr. Ostrovsky earned undergraduate degrees in mathematics and electrical engineering and a master of business administration degree from the University of Minnesota. He is recognized as an accredited valuation analyst by the National Association of Certified Valuation Analysts.

5    The California Occupational Employment Statistics Survey is an annual report produced jointly by the U.S. Department of Labor Bureau of Labor Statistics and the California Department of Labor, and it includes a comprehensive report of wage rates for workers in various industries.

6    The California Occupational Employment Statistics Survey reported that hourly wages for real estate brokers in southern California ranged from $32.99 (25th percentile) to $64.28 (75th percentile), with a median hourly wage of $48.44.

7    Mr. Ostrovsky acknowledged that Mr. McAlary reported that he often worked seven days a week, but he nevertheless used a standard 40–hour work week in computing Mr. McAlary's reasonable compensation.

8    Mr. Ostrovsky defined petitioner's peer group to include businesses described in the North American Industry Classification System (NAICS), Code No. 531210, Offices of Real Estate Agents and Brokers, and, specifically, real estate businesses in this category with annual net sales and assets under $1 million.

9    Risk Management Association (RMA) is a member association comprising financial institutions and professionals that regularly engage in risk analysis (e.g., credit, market, enterprise, and operation risk). RMA compiles financial performance data drawn from the financial statements of its member's customers-primarily small to medium-size businesses, including 457 businesses falling under NAICS Code 531210.

10    Mr. Ostrovsky did not explain how a comparison of compensation measured as a percentage of gross receipts with compensation measured as a percentage of net sales would aid the Court in this case. In the end, we do not find this portion of Mr. Ostrovsky's report to be persuasive or helpful.

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Office of Chief Counsel**
**Internal Revenue Service**

# memorandum

Number: **201315017**
Release Date: 4/12/2013

CC:PA:02MABond                      Third Party Communication: None
POSTN-147583-12                     Date of Communication: Not Applicable

UILC:   6721.00-00, 6722.00-00

date:   December 20, 2012

to:                   (Appeals Officer)
        (Internal Revenue Service, Domestic Operations)

from:                 (Senior Technician Reviewer)
        (CC:PA:01)

subject:   Divisibility of I.R.C. Section 6721 and Section 6722 Penalties

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

LEGEND

X               =

Amount 1        =

Amount 2        =

Years 1-5       =

ISSUES

Whether penalties assessed pursuant to the current versions of section 6721 and section 6722 are divisible for purposes of establishing refund suit jurisdiction.

CONCLUSIONS

The current section 6721 and section 6722 penalties are both divisible penalties for the purpose of establishing refund suit jurisdiction.

POSTN-147583-12                                2

FACTS

Taxpayer, X, is a
                                              .  X operates a large                    facility (
       ) on                 contiguous to X's                                .  Mainly from funds
derived from this            facility, X made numerous payments which were required to
be reported on Form 1099.  These payments included distributions of income to
                    and non-employee compensation to service providers.  X, however, failed to
report any of the payments to the payees or to the Service.  Additionally, X operated a
large check cashing operation but failed to comply with any of the registration and
reporting requirements under Title 31 and failed to file any forms reporting the currency
transactions.

Based on X's repeated failures to file and furnish appropriate information returns, the
Service imposed penalties under section 6721 in the amount of Amount 1 and section
6722 in the amount of Amount 2 for taxable Years 1-5.[1]  X has expressed interest in
seeking review of these penalties in federal district court.  Thus your office asked
whether a taxpayer must pay the current section 6721 or 6722 penalty amounts in full in
order to establish refund suit jurisdiction.  As a general rule, a taxpayer can only institute
a refund suit in a federal district court or the United States Claims Court if the taxpayer
pays the tax liability in full prior to the commencement of the suit.  Flora v. United
States, 362 U.S. 145 (1960).  Courts have recognized a limited exception to this so-
called "full payment rule" when the taxes are deemed divisible.  In that case, the
taxpayer need only pay a divisible portion of the tax to satisfy the payment prerequisite
to jurisdiction.  Thus, you have requested guidance from this office concerning whether
the current versions of section 6721 and section 6722 are divisible for the purpose of
establishing refund suit jurisdiction.  This memorandum responds to your request.

LAW AND ANALYSIS

To meet the jurisdictional requirements of a refund suit, a taxpayer must generally make
full payment of assessed taxes due before the matter may be adjudicated.  See Flora,
362 U.S. at 177.  In general, the partial payment of assessed taxes or a proposed
deficiency is insufficient to support refund suit jurisdiction.  Id.  The majority opinion in
Flora, however, noted that one possible exception to the full payment rule might exist
where certain "tax assessments may be divisible into a tax on each transaction or event,
so that the full-payment rule would probably require no more than payment of a small
amount."  Flora, 362 U.S. at 175-78, n.38.  The Court was referring at that time to
excise taxes.  The Court's analysis, however, hinged divisibility on a tax being levied on
each transaction or event.

Over time a limited exception to the "full payment rule" of Flora has developed with
respect to divisible tax assessments.  A divisible tax is one that may be divided into

---

[1] The penalties imposed were for cases of intentional disregard; as such, the "total amount imposed"
limits of $1,500,000 per penalty per year were not applied.  See discussion below.

separate portions or transactions, and only a portion of the tax must be paid before a claim is filed.  See Steele v. United States, 280 F.2d 89, 91 (8th Cir. 1960); Korobkin v. United States, 988 F.2d 975, 976 (9th Cir. 1993); Univ. of Chicago v. United States, 547 F.3d 773, 785 (7th Cir. 2008).

In Steele v. United States, which involved penalties assessed under section 6672, the Eighth Circuit, noting Flora, adopted the "partial payment rule" holding that a taxpayer assessed a penalty under section 6672 need only pay the divisible amount of the penalty assessment attributable to a single employee's withholding before instituting a refund action.  The taxpayer, therefore, only has to pay the withholding tax of one employee for each taxable period in order to establish refund suit jurisdiction.  Steele, 280 F.2d at 91.  See also Boynton v. United States, 566 F.2d 50, 52 (5th Cir. 1977) (same); Nordbrock v. United States, 173 F.Supp.2d 959 (D.Ariz. 2000), aff'd 248 F.3d 1172 (9th Cir. 2001) (found section 6695(d) tax preparer list penalties are divisible).

The hallmark of a divisible tax is that the gross tax imposed is composed of the accumulation of discrete assessments based on separate underlying transactions, rather than being one assessment flowing from a single underlying event.  By way of example, the Ninth Circuit stated that "[t]he paradigm [of a divisible tax] is excise taxes: If you're assessed $100 for each of a thousand widgets, you can pay $100 – the whole tax on one of the widgets – and then go to court."  Korobkin, 988 F.2d at 976 (citing to Flora, 362 U.S. at 171, n.37, 176, n.38).  In like manner, the Eighth Circuit cited examples of divisible taxes calculated "with respect to each document" and applied "to each such failure" in contrast to the non-transactional penalty at issue before it.  Gates v. United States, 874 F.2d 584, 587, n.3 (8th Cir. 1989).  In sum, divisible assessments are those taxes or penalties that are composed of several independent assessments created by separate transactions.  Thus, in order to determine if section 6721 and section 6722 are divisible penalties, one must determine if the penalties can be divided into separate transactions.

Section 6721, "Failure to file correct information returns" provides in part that "[i]n the case of a failure described in paragraph (2) by any person with respect to an information return, such person shall pay a penalty of $100 for each return with respect to which such a failure occurs, but the total amount imposed on such person for all such failures during any calendar year shall not exceed $1,500,000."  I.R.C. § 6721(a)(1).  Section 6721(a)(2) provides that for purposes of paragraph (1) the "failures described" are "any failure to file an information return with the Secretary on or before the required filing date, and any failure to include all of the information required to be shown on the return or the inclusion of incorrect information."  Section 6721(b) provides for reduced penalties in the case of correction within specified periods.  For correction within 30 days, the reduced penalty is "$30 in lieu of $100" for each failure, with the "total amount imposed" reduced to $250,000.  I.R.C. § 6721(b)(1).  For correction after the 30th day but "on or before August 1 of the calendar year in which the required filing date occurs" the amounts are "$60 in lieu of $100" and $500,000.  I.R.C. § 6721(b)(2).  Section 6721(e) provides for higher penalties in the case of intentional disregard of the filing

requirement.  The intentional disregard penalty is $250 or the greater of a percentage depending on the particular information reporting requirement.  I.R.C. § 6721(e).

Section 6722, "Failure to furnish correct payee statements" provides in part that "[i]n the case of each failure described in paragraph (2) by any person with respect to a payee statement, such person shall pay a penalty of $100 for each statement with respect to which such a failure occurs, but the total amount imposed on such person for all such failures during any calendar year shall not exceed $1,500,000." I.R.C. 6722(a)(1). Section 6722(a)(2) provides that for purposes of paragraph (1) the "failures described" are "any failure to furnish a payee statement on or before the date prescribed therefor to the person to whom such statement is required to be furnished, and any failure to include all of the information required to be shown on a payee statement or the inclusion of incorrect information."  Section 6722(b) provides for reduced penalties in the case of correction within specified periods.  For correction within 30 days, the reduced penalty is "$30 in lieu of $100" for each failure, with the "total amount imposed" reduced to $250,000.  I.R.C. § 6722(b)(1).  For correction after the 30th day but "on or before August 1 of the calendar year in which the required filing date occurs" the amounts are "$60 in lieu of $100" and $500,000.  I.R.C. § 6722(b)(2).  Section 6722(e) provides for higher penalties in the case of intentional disregard of the requirement to furnish correct payee statements.  The intentional disregard penalty is $250 or the greater of a percentage depending on the particular payee statement requirement.  I.R.C. § 6722(e).

There are at least three reasons why penalties imposed under section 6721 and section 6722 can be divided into separate transactions and are thus divisible.  First, each assessment under both 6721 and 6722 is imposed with respect to a distinct failure that is a separate "transaction" for purposes of the penalty.  Under the general rules of both penalties, a $100 penalty is imposed per failure with respect to the document at issue (an information return or payee statement, as applicable).  I.R.C. §§ 6721(a), 6722(a).  This is precisely the type of transaction-based penalty as those described by the Gates court as calculated "with respect to each document" and applied "to each such failure." Gates, 874 F.2d  at 587, n.3.  The penalty structure follows the paradigm offered by the Ninth Circuit, "If you're assessed $100 for each of a thousand [failures], you can pay $100 – the whole tax on one of the [failures] – and then go to court."  Korobkin, 988 F.2d at 976.

Second, not only are both penalties applied on a per-failure basis, but the amount of the penalty applicable to each failure is adjusted based on the circumstances surrounding the individual failure.  Subsection (b) of both 6721 and 6722 provides that the penalty imposed by subsection (a) of the applicable penalty "shall be $30 in lieu of $100" if "any failure described in subsection (a)(2) is corrected on or before the day 30 days after the required filing date."  And subsection (e) of both 6721 and 6722 provides that "[i]f 1 or more failures…are due to intentional disregard" then "with respect to each such failure" the penalty shall be $250 or greater.  This determination of penalty amount based on the circumstances of each failure shows that each failure is a separate, distinct transaction upon which the 6721 and 6722 penalties are based.

POSTN-147583-12                              5

Third, the section 6724 reasonable-cause waiver applicable to sections 6721 and 6722 shows that these are transaction-based penalties. The waiver reads in relevant part: "No penalty shall be imposed under this part with respect to any failure if it is shown that *such failure* is due to reasonable cause and not to willful neglect." I.R.C. § 6724(a) (emphasis added). Thus, like the penalty amount, penalty waiver is determined on a per-transaction basis.

In sum, based on the foregoing, the current section 6721 and section 6722 penalties should be treated as divisible penalties. A taxpayer assessed with a penalty under either of these sections need only pay the divisible amount of the penalty attributable to a single failure, or $100 under the general rule, before filing a refund claim and instituting a refund suit under section 7422.

It should be noted that under both sections 6721 and 6722 the "total amount imposed" per section on a person "for all such failures during any calendar year shall not exceed $1,500,000." I.R.C. §§ 6721(a), 6722(a). This maximum is reduced in the case of corrected failures, and does not apply to cases of intentional disregard. I.R.C. §§ 6721(b), (e); 6722(b), (e). While an argument might be made that the "total amount imposed" becomes a single lump penalty rather than a penalty based on separate underlying transactions, this argument is without merit. A cap on the gross penalty amount actually imposed on a taxpayer does not change the fact that the penalty is calculated first and foremost by adding up the individual penalties assessed on each separate underlying failure.

This writing may contain privileged information. Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information. If disclosure is determined to be necessary, please contact this office for our views.

Please call              at                        if you have any further questions.

before he was on with the new.   There are exceptions to this; obviously in examples 9, 10, 11, 12, and 15, where the dash is at the end or beginning of a sentence ; and perhaps also in sentences of which the reader can clearly foresee the grammatical development.   In example 7, for instance, it is clear that a participle (*displayed* or another) is due after *never was* &c. ; a comma after *intelligence* is therefore definitely expected.   So in example 6 we are expecting either another continuation of *as soon as,* or the principal sentence, before either of which a comma is looked for.   In examples 2 and 3, on the other hand, the sentence may for all we know be complete at the place where the dash stands, so that no expectation is disappointed by omitting the comma.   The rule, then, should be that a dash is a substitute for any internal stop, and not an addition to it, except when, from the reader's point of view, a particular stop seemed inevitable.

It must be admitted that that conclusion is not very certain, and also that the matter is of no great importance, provided that the stops, if inserted, are the right ones.   More certainty is possible about the combination of stops with the double dash, which we have not yet considered.   The probable origin of the double dash will be touched upon when we come to the second question ; but whatever its origin, it is now simply equivalent to a pair of brackets, except that it is slightly less conspicuous, and sometimes preferred on that account.   Consequently, the same rule about stops will apply to both, and as there is no occasion to treat of brackets separately, it may here be stated for both.   The use of a parenthesis being to insert, without damage to the rest of the sentence, something that is of theoretically minor importance, it is necessary that we should be able simply to remove the two dashes or brackets with everything enclosed by them, and after their removal find the sentence complete and rightly punctuated.   Further there is no reason for using inside the parenthesis any stop that has not an internal value ; that is, no stop can possibly

needed just before the second dash except an exclamation or question mark, and none at all just after the first ; but stops may be necessary to divide up the parenthesis itself if it is compound.   Three examples follow, with the proper corrections in brackets :

17. Garinet cites the case of a girl near Amiens possessed by three demons,—Mimi, Zozo, and Crapoulet,—in 1816.—LOWELL.   (Omit both commas ; the first is indeed just possible, though not required, in the principal sentence ; the last is absolutely meaningless in the parenthesis)

18. Its visions and its delights are too penetrating,—too living,—for any white-washed object or shallow fountain long to endure or to supply.— RUSKIN.   (Omit both commas ; this time the first is as impossible in the principal sentence as the second is meaningless in the parenthesis)

19. The second carries us on from 1625 to 1714—less than a century— yet the walls of the big hall in the Examination Schools are not only well covered . . .—*Times.*   (Insert a comma, as necessary to the principal sentence, outside the dashes ; whether before the first or after the last will be explained in our answer to the third question)

The second question is, how far the authority of the dash extends.   There is no reason, in the nature of things, why we should not on the one hand be relieved of it by the next stop, or on the other be subject to it till the paragraph ends.   The three following examples, which we shall correct in brackets by anticipation, but which we shall also assume not to be mere careless blunders, seem to go on the first hypothesis.

20. The Moral Nature, that Law of laws, whose revelations introduce greatness—yea, God himself, into the open soul, is not explored.— EMERSON.   (Substitute a dash for the comma after *himself.*   Here, however, Emerson expects us to terminate the authority at the right comma rather than at the first that comes, making things worse)

21. I . . . there complained of the common notions of the special virtues —justice, &c., as too vague to furnish exact determinations of the actions enjoined under them.—H. SIDGWICK.   (Substitute a dash for the comma after *&c.*)

22. There are vicars and vicars, and of all sorts I love an innovating vicar a piebald progressive professional reactionary, the least.—H. G. WELLS. (Substitute a dash for the comma after *reactionary*)

It needs no further demonstration, however, that commas